UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EDUARDO HERNANDEZ,

            Plaintiff,

    v.

T. WOOD,[1] et al.,

            Defendants.

Case No.  13-cv-05633-YGR (PR)

**ORDER GRANTING DEFENDANTS'
JOINT MOTION TO DISMISS AND
MOTION FOR SUMMARY
JUDGMENT; AND ADDRESSING
PLAINTIFF'S PENDING MOTIONS**

## I.    INTRODUCTION

Plaintiff Eduardo Hernandez, a state prisoner currently incarcerated at the California Medical Facility ("CMF"), filed this *pro se* civil rights action under 42 U.S.C. § 1983, alleging multiple constitutional violations stemming from his previous incarceration at Pelican Bay State Prison ("PBSP") and relating to a June 9, 2011 incident in which he got into an altercation with another prisoner, inmate Miller.  Plaintiff named the following Defendants: Captain T. Wood; Lieutenants F. Vanderhoofven[2] and R. Tupy; Sergeants T. Cabrera, R. Presler, and R. Butcher; Correctional Officers G. Pimentel, D. Yang, J. Clemons, T. Osten, and B. Newton; Registered Nurses ("RN") S. Nakamura and V. Lentz; and Licensed Vocational Nurse ("LVN") M. Creed. Plaintiff seeks injunctive and declaratory relief as well as monetary damages.

The parties are presently before the Court on Defendants' Joint Motion to Dismiss and Motion for Summary Judgment.  Dkt. 53.  Plaintiff has filed an opposition to Defendants' joint motion, and Defendants have filed a joint reply.  Dkts. 101-103, 110.  Finally, Plaintiff filed an

---

[1] Defendant Wood's last name was misspelled in previous Court documents as "Woods." The correct spelling is Wood.  *See* Wood Decl., Dkt. 71.

[2] Defendant Vanderhoofven's last name was misspelled in previous Court documents as "Vanderhoofvan."  The correct spelling is Vanderhoofven.  *See* Vanderhoofven Decl., Dkt. 70.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  unsolicited sureply to Defendants' Joint Reply. Dkt. 113.[3]  There are also other pending motions

2  filed by Plaintiff, including his "Motion for Correction of Record from the Court's Incorrect and

3  Inflammatory Statements" (dkt. 56) and "Motion for Reconsideration for Pro Bono

4  Assignment/Order for Defendants' Colleagues (CDCR) to Refrain from Harassment Via

5  Inappropriate Housing-Moves-Transfers/For Defendant[s'] Colleagues to Appropriately House

6  Plaintiff in General Population Without Further Harassment" (dkt. 108), which will be addressed

7  below.

8        Having read and considered the papers submitted and being fully informed, the Court

9  hereby GRANTS Defendants' joint dispositive motion and addresses Plaintiff's pending motions.

10  **II.    FACTUAL BACKGROUND**

11    **A.    Plaintiff's Version**

12        In his verified complaint, Plaintiff claims that on June 9, 2011, his cell door was opened

13  without any explanation, and he assumed it was because he was to line up to receive his

14  medication. Dkt. 1-1 (Supp. to Compl.) at 7-8.  As Plaintiff prepared to line up, inmate Miller was

15  released and an altercation took place between inmate Miller and Plaintiff. *Id.* at 8.  Both Plaintiff

16  and inmate Miller were sprayed with oleoresin capsicum ("OC") spray and shot with a "40 mm.

17  launcher" to break up their altercation, and Plaintiff claims that he was not offered proper

18  decontamination from the effects of the OC spray. *Id.* at 8-9.  Plaintiff claims that Defendant

19  Pimentel had to retrieve his camera to take pictures of Plaintiff's injuries and made Plaintiff wait

20  an hour while Defendants Nakamura, Lentz, Creed, Wood and Tupy refused to provide first aid

21  and decontaminate him. *Id.* at 10-13.  Plaintiff claims that Defendant Pimentel had shouted for

22  "no-one '. . . to attend or wipe [Plaintiff] off until he returned . . . ' (with [his] camera . . . for

23  photographs)." *Id.* at 10.  While Defendant Pimentel was gone, Plaintiff claims that he had

24  "difficulty breathing, [was] coughing up spit as he drown[ed] and choked on his mucus." *Id.* at

25  12.  Plaintiff claims that Defendant Nakamura "put a rag over [his] mouth and nose . . . ." *Id.*

26

27        [3] The Local Rules do not permit the filing of a response to a reply.  *See* Civ. L.R. 7-3(d).
28  However, the Court shall consider Plaintiff's sureply, which has been signed under penalty of
   perjury.  Therefore, Plaintiff is GRANTED leave to file a sureply.

United States District Court
Northern District of California

Plaintiff could hear Defendants Wood and Tupy, and he requested that they "order medical staff Defendants to provide first aid and/or to have someone decontaminate him from the painful mace." *Id.* Defendants Wood and Tupy did not reply to Plaintiff's request. *Id.* Defendant Pimentel arrived with his camera "approx. 1 hr. later." *Id.* at 13. While Plaintiff was being photographed, medical staff began to treat Plaintiff's injuries but failed "to take [him] to a shower to be properly decontaminated from the painful burning mace." *Id.* When Plaintiff asked Defendants Lentz and Creed to decontaminate him, they refused because of lack of time since he was being taken to the hospital. *Id.* Plaintiff claims medical staff "attempted to relieve his burning pain by squeezing a wet rag over him," but he did not feel any relief. *Id.* The ambulance arrived at 9:30 p.m. *Id.*

Plaintiff claims that an hour and a half after the incident, he was eventually taken to the hospital, where medical staff attempted to decontaminate him and treat his other injuries, including injuries to his right foot, left right finger and right thumb, as well as multiple lacerations and abrasions to his head and body. *Id.* at 14-15. In order to decontaminate him, the nurse "brought some yogurt to apply on Plaintiff's most visable [sic] [a]ffected areas of burning to attempt to relieve his pain." *Id.* The nurse then asked prison staff to wheel Plaintiff to the ambulance dock where there was a nozzle that was twenty feet high and "an attempt was made to wash [him] off." *Id.* at 15. Plaintiff claims he "sat naked . . .under the [nozzle] [and] the water fell in a mist making the burning worse as it only reactivated the dry mace." *Id.* When he returned to prison around 3:00 a.m. the next day June 10, 2011, Plaintiff claims he was still in need of more decontamination. *Id.* at 15-16. Plaintiff requested Defendants Butcher and Presler to allow him to take a shower, but they refused because they said Plaintiff had already been decontaminated and "would be afforded the opportunity to shower at third watch [between 2:00 p.m. and 10:00 p.m.]." *Id.* at 15-17. It was not until 3:00 p.m., twenty hours after the incident, that Plaintiff was allowed to fully decontaminate by taking a shower. *Id.* at 18.

On June 17, 2011, Plaintiff was served with a serious rules violation report ("RVR") for "attempted murder." *Id.* at 21. Plaintiff claims, among other violations, he was denied the rights to prepare for the disciplinary hearing and to call witnesses. *Id.* at 21, 27. After the disciplinary

1    hearing, Plaintiff was assessed a 360-day good time credit loss and sentenced to a three-year term

2    at the Segregated Housing Unit ("SHU").  *Id.* at 22.

3        **B.    Defendants' Version**

4            **1.   PBSP's Use of Force Policy**

5            PBSP has a uniform use of force policy governing the force staff may use, and PBSP staff

6    receives appropriate annual training in order to understand such policies and procedures, including

7    both the application of force and subsequent reporting and documentation requirements.  Tupy

8    Decl. ¶ 10, Ex. D, Dkt. 69.  The policy states that employees may use reasonable force as required

9    in the performance of their duties, and defines reasonable force as "the force that an objective,

10   trained, and competent correctional employee faced with similar facts and circumstances, would

11   consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or

12   gain compliance with a lawful order."  *Id.*, Ex. D at 317.  The policy authorizes employees to use

13   "immediate force without prior authorization from a higher official"; "immediate force" is defined

14   as "the force used to respond without delay to inmate behavior that constitutes an immediate threat

15   to institution/facility security or the safety of persons."  *Id.*  Use of force under the policy includes,

16   but are not limited to, chemical agents, hand-held batons, physical strength and holds, and "less-

17   lethal weapons" such as a 40 mm. launcher used to fire "less-lethal projectiles."  *Id.*, Ex. D at 318.

18   The policy states that the aforementioned "[u]se of force options do not have to be utilized in any

19   particular sequence, but should be the force option staff believes is sufficient."  *Id.*  Finally, while

20   the policy does not have a section relating to assaults outside of the cell, it specifically includes a

21   section on "In-Cell Assaults," which specifies that "[i]f the inmates continue to fight or one inmate

22   continues to assault the other, staff are authorized to use chemical agents to stop the incident."  *Id.*,

23   Ex. D at 319.

24          **2.   June 9, 2011 Incident**

25          On June 9, 2011, Defendant Yang was the control booth operator of Block D-6 of the

26   SHU, where Plaintiff and inmate Miller were housed in cell #224 and cell #223, respectively.

27   Yang Decl. ¶ 3, 9, Dkt. 72.  As Defendant Yang was performing his duties on that date, he noticed

28   that inmate Miller needed to return from the yard to his cell, which was in F-pod.  *Id.* ¶ 6.

4

Defendant Yang visually inspected F-pod to ensure that all inmates were secured in their cells before he attempted to return inmate Miller back to cell #223. *Id.* ¶ 7. Defendant Yang then opened the F-pod yard door to let inmate Miller in, then closed the door behind him. *Id.* ¶ 8. Defendant Yang claims that he "intended to open [inmate] Miller's cell #223 so that he could enter it." *Id.* ¶ 9. Instead, Defendant Yang claims he "mistakenly opened the cell #224 belonging to [Plaintiff.]," *Id.* Defendant Yang claims that he "<u>mistakenly</u> put the red control key into the plug for cell #224, and not cell #223" and that "[t]he plugs are separated by approximately 1/2 inches." *Id.* (emphasis in original). Defendant Yang stresses that he made a "mistake" and that it was "not [his] intent that anyone get hurt." *Id.* As soon as Defendant Yang opened Plaintiff's cell door, Plaintiff "rushed out of his cell and started down the stairs toward [inmate] Miller." *Id.* ¶ 10. Defendant Yang "ordered [Plaintiff] to return to his assigned cell but he continued to rush at [inmate] Miller down the stairs in an aggressive manner." *Id.* Defendant Yang pressed his Personal Alarm Device to call additional staff to respond to the incident. *Id.* ¶ 11. Defendant Yang ordered both inmate Miller and Plaintiff to stop fighting and to get down, but both inmates "refused to follow orders and continued to fight with one another." *Id.* ¶ 12.

Defendant Osten, who was working with Defendant Yang on June 9, 2011, was assigned as the floor officer at Block D-6. Osten Decl. ¶ 2, Dkt. 65. While Defendant Yang was stationed in the control booth, Defendant Osten stood down in the rotunda of Block D-6. *Id.* The rotunda is enclosed and separated from the six pods, and doors with cuff ports connect the rotunda to each pod. *Id.* At around 7:53 p.m., Defendant Osten heard Defendant Yang yell "get down," and looked up and saw that Defendant Yang was looking into the F-pod. *Id.* ¶ 3. Defendant Osten then rushed over to the F-pod, and saw Plaintiff and inmate Miller fighting with each other. *Id.* They were both striking each other in the face and upper body. *Id.* At that point, Defendants Osten and Yang were the only two staff present. *Id.* Defendant Osten then ordered Plaintiff and inmate Miller to stop fighting and get down, but they continued to fight on the stairs in the F-pod, and he saw Plaintiff grab inmate Miller's right arm and try to hold onto it. *Id.* ¶ 4. Inmate Miller then struck Plaintiff in the face with his left fist and kicked Plaintiff multiple times in his lower legs. *Id.* As inmate Miller and Plaintiff continued fighting and moved down from the stairs where

the fight had started, Defendant Osten could see slash marks on Plaintiff's back and large amounts of blood coming from Plaintiff's face. *Id.* ¶ 5. At that point, additional custody staff had arrived in response to an alarm. *Id.*, Ex. A.

Defendants Clemons and Newton were in block D-9 when they heard the alarm, and immediately responded. Osten Decl. ¶ 7; Clemons Decl. ¶ 3, Dkt. 57; Newton Decl. ¶ 3, Dkt. 64. When they entered Block D-6, they saw that both Plaintiff and inmate Miller fighting, and both inmates had blood on their faces and hands. Clemons Decl. ¶ 3; Newton Decl. ¶ 4. Defendants Newton and Clemons also ordered Plaintiff and inmate Miller to stop fighting and get down, but the inmates ignored these orders and kept fighting. Clemons Decl. ¶ 4; Newton Decl. ¶ 5. Defendant Clemons then opened the cuff port on the F-pod door, and ordered the inmates to stop fighting and to "get down" but they ignored his commands. Clemons Decl. ¶ 5. Defendant Clemons positioned his OC spray through the pod-door cuff port, and he sprayed both inmates in the face and head with a one-to-two-second burst of OC spray. Clemons Decl. ¶ 6. Plaintiff and inmate Miller continued to fight. Clemons Decl. ¶ 5; Newton Decl. ¶ 6; Osten Decl. ¶ 7.

Defendant Clemons again ordered Plaintiff and Miller to stop fighting and to get down, but they continued to fight and ignored his commands. Clemons Decl. ¶ 6. Defendant Clemons used his OC spray a second time and sprayed a one-to-two-second burst at the inmates' faces, but the inmates still continued to fight. Clemons Decl. ¶ 6; Newton Decl. ¶ 7; Osten Decl. ¶ 7. Defendant Clemons saw inmate Miller stomp on Plaintiff's right foot. Clemons Decl. ¶ 6. After the second use of OC spray failed to stop the fight, Defendant Yang, from the control booth, fired one exact impact round from his 40 mm. single shot launcher, intending to hit inmate Miller's lower left leg, but "due to the scuffle, he hit Plaintiff in the lower right shin area instead." Yang Decl. ¶ 14; Clemons Decl. ¶ 6; Newton Decl. ¶¶ 7-9; Osten Decl. ¶¶ 7-8.

Defendants Clemons and Yang claim that they used the two bursts of OC spray and the exact impact round in quick succession to stop Plaintiff and inmate Miller from fighting because they refused to obey commands to stop and get down, and these officers needed to restore order. Clemons Decl. ¶ 8; Yang Decl. ¶ 18-19.

After being hit with the exact impact round, Plaintiff stopped fighting, released inmate

6

1    Miller's right hand and moved toward the F-pod door.  Newton Decl. ¶ 10.  Inmate Miller also

2    stopped fighting, moved toward the pod doors, and slid something under the door of cell #122,

3    which was occupied by an inmate Avila.  *Id.* ¶¶ 11-12.  Inmate Miller then moved to the back of

4    the F-pod between cell #124 and the F-pod yard door, and yelled "that's fucking north side bitch."

5    *Id.* ¶ 12.

6        Defendant Cabrera, who was working as sergeant in section D of the SHU, arrived at

7    Block D-6 shortly after the two inmates had been separated, and he took command.  Cabrera Decl.

8    ¶¶ 2-5, Dkt. 55.  Plaintiff was near the F-pod door and was leaning against the wall, while inmate

9    Miller was standing at the far side of the F-pod near the yard door.  *Id.* ¶ 5.  Inmate Miller

10   continued to attempt to approach Plaintiff several times, but Defendants Cabrera and Clemons

11   repeatedly ordered inmate Miller to "get down" and to "get down on the ground," but inmate

12   Miller refused to comply.  *Id.* ¶ 6.  Plaintiff also refused to comply with their orders to get down.

13   Clemons Decl. ¶ 9.  This "stand-off" continued for about two minutes.  *Id.*

14       After several more orders to get down, inmate Miller and Plaintiff finally complied.  Osten

15   Decl. ¶ 11.  Defendant Cabrera then directed prison staff to open the yard door and ordered inmate

16   Miller to go out into the exercise yard, which he did.  Cabrera Decl. ¶ 9.  Once inmate Miller was

17   in the yard, prison staff then closed the yard door.  *Id.*

18       After inmate Miller was moved out to the yard, Plaintiff complied with Defendants' orders

19   to move backwards towards the pod door to submit to handcuffs, and Defendant Clemons was

20   able to handcuff him through the cuff port.  Clemons Decl. ¶ 11.  According to Defendant

21   Clemons, under PBSP's policies and procedures, he could not have entered the F-pod to handcuff

22   Plaintiff before he was physically able to move to the cuff port and submit to handcuffs.  *Id.* ¶ 12.

23   Also, under PBSP's policy and procedures inmates must be handcuffed before they are escorted to

24   other areas of the prison, such as the clinic.  Tupy Decl. ¶ 12.

25       Once Plaintiff was handcuffed, prison staff opened the F-pod door and removed him from

26   the F-pod.  Newton Decl. ¶ 15, Clemons Decl. ¶ 14.  Defendants Clemons and Newton then placed

27   Plaintiff on a gurney and escorted him to the D-Facility clinic for medical treatment.  Newton

28   Decl. ¶ 15, Clemons Decl. ¶ 15.

Once inmate Miller and Plaintiff had been removed from F-pod, Defendant Pimentel located a "screw-type" weapon on the floor between the stairway and the pod door.  Pimentel Decl. ¶ 8, Dkt. 66.  Prison staff also searched inmate Avila's cell because officers suspected that inmate Miller had "slid an unidentified object, suspected of being the weapon used to assault [Plaintiff], under the cell."  Clemons Decl., Ex. A at 2.  However, "no weapon was found."  *Id.*

### 3.  Defendants' Response to Plaintiff's Injuries

Defendant Creed, who is an LVN, had responded to Defendant Yang's alarm and was present when Plaintiff was removed from F-pod.  Creed Decl. ¶ 2, Dkt. 58.  At around 7:58 p.m., LVN Smith called Defendant Nakamura, a RN, to assist them.  *Id.* ¶ 4.  Defendant Creed states that Plaintiff had slashes on his body, including on the left side and top of his head, right upper chest, upper and lower back, left forearm, and right shin.  *Id.* ¶ 3.  Based on the extent of Plaintiff's injuries, once he was removed from the F-pod, he was immediately taken to the D-Facility clinic for medical treatment.  Cabrera Decl. ¶¶ 11, 13.

As Defendants Newton and Clemons were wheeling Plaintiff to the D-Facility clinic, they were met by medical staff, including Defendants Nakamura and Lentz (both RNs), who immediately began providing first aid to treat Plaintiff's injuries and tried to stop the bleeding from wounds on Plaintiff's face and neck.  Creed Decl. ¶ 5; Lentz Decl. ¶ 4, Dkt. 62; Nakamura Decl. ¶ 4, Dkt. 63.  By 8:02 p.m., Defendants Nakamura and Lentz had arrived at the D-Facility clinic and continued treating Plaintiff.  Nakamura Decl. ¶ 3.  Defendants Creed, Nakamura, and Lentz performed basic first aid, and treated and assessed Plaintiff's injuries.  *Id.* ¶¶ 4-13; Creed Decl. ¶¶ 5-8; Lentz Decl. ¶¶ 4-6; Sayre Decl. ¶¶ 5-12, Dkt. 68.  Defendant Nakamura was concerned Plaintiff had injured his neck and back in the fight, and had to stabilize his neck as a precaution.  Nakamura Decl. ¶ 5.  Medical staff applied a short c-collar to his neck and also placed him on a back-board after custody staff switched his hand-cuffs to waist chains.  Nakamura Decl. ¶¶ 7, 12-13.  These are standard protocols for treating a potential neck trauma, and a patient's neck must remain stabilized until a physician confirms no neck injury has occurred.  Lentz Decl. ¶ 6.

Because of his injuries, medical staff could not allow Plaintiff to decontaminate from the OC spray by showering, but Plaintiff did receive other forms of decontamination.  Nakamura

United States District Court
Northern District of California

1  Decl. ¶¶ 5, 10; Creed Decl. ¶¶ 7-8; Clemons Decl. ¶ 14.  Plaintiff was removed from the area

2  where the OC spray was used, and medical staff also flushed his eyes and face with cold water

3  multiple times.  *Id.*  Medical staff also helped Plaintiff blow his nose.  Nakamura Decl. ¶ 5.

4  Defendant Nakamura confirmed that Plaintiff's airway, breathing and circulation were intact.  *Id.*

5      PBSP's OC decontamination policy indicates decontamination "may be accomplished by

6  exposing the individual to fresh moving air, or flushing the affect body area with cool water, e.g.,

7  shower, sink water, or wet cloths."  Tupy Decl., Ex. D at 321.  Also, "[n]o other decontamination

8  is necessary for inmates who have been medically treated and health care staff have determined

9  the inmate has been decontaminated."  *Id.*

10      At around 8:40 p.m., Plaintiff was wheeled out of the D-facility on a gurney to be

11  transported to the Urgent Treatment Area in PBSP's Correctional Treatment Center ("CTC") for

12  additional medical treatment.  Creed Decl. ¶ 9.  By 9:07 p.m., an ambulance arrived to take

13  Plaintiff to Sutter Coast Hospital.  Sayre Decl., Ex. B; Daniels Decl., Ex. A, Dkt. 59; Nakamura

14  Decl. ¶¶ 14-15.  Plaintiff arrived at the hospital at 9:33 p.m. and received further treatment for his

15  injuries which consisted of a broken right foot and right thumb, dislocated left ring finger, multiple

16  lacerations to his head, multiple abrasions to the scalp and back, and numerous cuts and bruises.

17  Sayre Decl. ¶¶ 16-20, Exs. B-C; Daniels Decl. Ex. A.

18      As mentioned above, Plaintiff claims he returned to PBSP early on June 10, 2011 at around

19  3 a.m. Dkt. 1-1 at 15-16.  Plaintiff was housed in the CTC in order for prison medical staff to

20  continue providing medical care.  Butcher Decl. ¶ 2, Dkt. 54.  At around 4:10 a.m., Plaintiff asked

21  Defendant Butcher for permission to shower.  *Id.*  Defendant Butcher denied this request because

22  Plaintiff had already been decontaminated from OC spray, and during first watch, which is from

23  10:00 p.m. to 6:00 a.m., fewer custody staff are working.  *Id.* ¶¶ 3, 4.  Consequently, because there

24  are less staff to supervise inmates during first watch, inmates are not allowed to leave their cells

25  except in emergencies.  *Id.* ¶ 4.  Defendant Butcher instructed Plaintiff on how to further

26  decontaminate in his cell using water from the sink.  *Id.* ¶ 5.

27      During second watch, which runs from 6:00 a.m. to 2:00 p.m., Plaintiff requested that

28  Defendant Presler allow him to shower.  Presler Decl. ¶ 2, Dkt. 67.  Defendant Presler denied this

request because he understood that Plaintiff had already been decontaminated from the OC spray by medical staff. *Id.* ¶ 3. Defendant Presler told Plaintiff he could shower during third watch, between 2:00 p.m. and 10:00 p.m., which is the timeframe inmates housed in the CTC are permitted to shower. *Id.* ¶ 4. Defendant Presler also instructed Plaintiff on how to further decontaminate using water from the sink. *Id.* ¶ 5. As mentioned above, Plaintiff claims that at 3:00 p.m. he was able to take a shower. Dkt. 1-1 at 18.

### 4. Defendants Creed And Nakamura Documented Plaintiff's Medical Care

Both Defendants Creed and Nakamura wrote notes on Plaintiff's medical treatment, and saved and protected their notes in the Madrid Patient Information Management System ("Patient Information System"), a database used to store and track medical records concerning healthcare provided to inmates at PBSP. Creed Decl. Ex. A; Nakamura Decl. Ex. A; Hoheb Decl. ¶¶ 2-4. Once a record is protected in the Patient Information System, it cannot be changed. *Id.* Defendant Nakamura wrote two notes on the care Plaintiff received after his fight. Nakamura Decl. ¶ 17, Ex. A. Defendant Nakamura protected the first note on June 9, 2011 at 9:57 p.m., and the second note on June 10, 2011 at 8:41 a.m. *Id.* He could not revise these notes after protecting them. *Id.*

### 5. Serious Rules Violation for Attempted Murder

Plaintiff received a serious rules violation for attempted murder for his actions during the June 9, 2011 fight with inmate Miller. Vanderhoofven Decl., Ex. A.

Plaintiff was served with a copy of the serious rules violation report ("RVR") on June 17, 2011, which is within fifteen days of the June 9, 2011 incident, along with the related incident report documents prepared by staff. *Id.* ¶ 5, Ex. B. Plaintiff elected to postpone his hearing on the aforementioned serious RVR until after the district attorney determined whether to initiate criminal proceedings. *Id.* ¶ 7, Ex. B. On August 19, 2011, the district attorney notified PBSP that Plaintiff would not be prosecuted concerning the June 9, 2011 incident. *Id.* ¶ 7; Ex. A.

On September 8, 2011, Plaintiff requested a staff assistant and an investigative employee ("I.E."), but his requests were denied. *Id.*, Ex. B.

Less than thirty days after August 19, 2011, on September 15, 2011, a hearing was held before Defendant Vanderhoofven. *Id.*, Ex. A. At the September 15, 2011 hearing, Defendant

United States District Court
Northern District of California

10

Vanderhoofven states that he denied the staff assistant request because he did not meet the criteria for appointment of a staff assistant under section 3315(d)(2) of Title 15 of the California Code of Regulations.  *Id.* ¶ 9.  The aforementioned section, entitled "Staff Assistant," states that staff assistants shall be assigned to assist an inmate in the preparation, and presentation of a defense at the disciplinary hearing if the classifying official determines: (1) the inmate is illiterate or non-English speaking; (2) the complexity of the issues are such that assistance is necessary so the inmate comprehends the nature of the charges or the disciplinary process; or (3) the inmate's disability is such that staff assistance would be necessary for the inmate to participate in the disciplinary process.  Cal. Code Regs. tit. 15, § 3315(d)(2)(A).  During Plaintiff's September 2011 hearing, Defendant Vanderhoofven denied Plaintiff's request for a staff attorney upon determining that Plaintiff "spoke English, was highly literate, understood the charges against him and the hearing process, and was not disabled."  Vanderhoofven Decl. ¶ 9.

Also at the September 15, 2011 hearing, Defendant Vanderhoofven similarly denied Plaintiff's request for an I.E. because he was not entitled to one based on section 3315(d)(1) of Title 15 of the California Code of Regulations.  *Id.* ¶ 10.  The aforementioned section, entitled "Investigative Employee" states: "[a]n investigative employee, as described in section 3318(a), shall be assigned when the staff designated to classify the serious rule violation determines that: (1) the complexity of the issues require further investigation; (2) the housing status makes it unlikely the charged inmate can collect and present the evidence necessary for an adequate presentation of a defense; (3) a determination has been made that additional information is necessary for a fair hearing; and (4) the behavior may present a nexus with a Security Threat Group.  Defendant Vanderhoofven claims that he denied Plaintiff's I.E. request because none of the aforementioned factors were present in Plaintiff's case.  *Id.*  Defendant Vanderhoofven elaborates on his claim as follows:

> [Plaintiff] was charged with attempted murder for fighting with another inmate, Miller, and there was no dispute that he and Miller fought, that a weapon was used in the fight, or about the extent of Miller's injuries from the fight.  Therefore, the issues in his case were not complex.  And though [Plaintiff] was housed in restrictive housing, the information available to him was sufficient for him to present a defense to the charge of attempted murder.  I also

> confirmed that the reason [Plaintiff] wanted an investigative employee was so he could obtain additional documents about the force officers used to stop the fight.  But [Plaintiff] already had copies of all documents that he was entitled to concerning the June 9, 2011 incident, including the Rules Violation Report and Incident Report.   In addition, during the hearing, he had access to photographs of the crime scene, and he had been allowed to examine those photographs more than 24 hours before the hearing. I also reviewed the photographs with [Plaintiff] during his hearing. Therefore, [Plaintiff] did not demonstrate that an assigned investigative employee would have obtained any additional, relevant information required for his defense or that his housing restrictions prevented him from obtaining information required for his defense.

*Id.*

Plaintiff also requested that Defendant Clemmons, who was designated as the "Reporting Employee," appear as a witness.  *Id.* ¶ 11.  Defendant Vanderhoofven granted Plaintiff's request, but claims that he "realized Plaintiff's questions concerned the force [Defendant] Clemmons and other staff were required to use to stop Plaintiff and [inmate] Miller from fighting, rather than the attempted murder charge against Plaintiff."  *Id.*   Defendant Vanderhoofven did not allow Plaintiff to proceed with that line of questioning because his questions for Defendant Clemons were "not relevant to the attempted murder charge."  *Id.*

During the hearing, Plaintiff presented Defendant Vanderhoofven with a CDCR Form 22, Request for Interview, Item or Service, and requested copies of numerous confidential documents. *Id.* ¶ 12.  Defendant Vanderhoofven listed the documents Plaintiff requested on the hearing summary.  *Id.*, Ex. A.  Defendant Vanderhoofven denied Plaintiff's request upon advising him that the documents requested were "not germane to the conduct reported in the Rules Violation Report."

During the hearing, Defendant Vanderhoofven reviewed the RVR, the photographs taken of the crime scene and of Plaintiff's and inmate Miller's injuries, the Incident Report and supplements to it, and non-confidential medical reports including CDCR 7219 forms that outlined the injuries inmate Miller and Plaintiff sustained during their fight.  *Id.* ¶ 13.  Based upon his review of the evidence, Defendant Vanderhoofven "determined that a preponderance of evidence existed demonstrating that Plaintiff was guilty of attempted murder."  *Id.* ¶ 14.  Specifically, Defendant Vanderhoofven stated his decision in the hearing summary as follows:

1
2
3
4
5
6
7
8
9

> Finding: Guilty of the Div. A-1 (1) offense ATTEMPTED MURDER. *Murder* is the deliberate killing of another person with either malice aforethought of reckless indifference. The intent to commit murder rather than battery can be judged by the expressed intent of the inmate of the nature of the attack and the weapon used. If any reasonable person would assume death as the most likely outcome from the nature of the attack or the weapon used, this offense qualifies as *Attempted Murder*. *Attempted* means the offense was begun by not completed because of circumstances beyond the control of the inmate. Attempted must also include present ability. *Present ability* means the attempt could have succeeded. Penal Code 31 and Title 15 defines a *Principle* as a person involved in the commission of a crime, felony or misdemeanor, whether they directly commit the act constituting the offense, or aid and abet in its commission, or not being present have advised and encouraged its commission, or who, by threats, menaces, command or coercion, compel another to commit any crime.

10    *Id.*, Ex. A at 2. Defendant Vanderhoofven then proceeded to explain that his finding was based

11    upon the following preponderance of evidence, which included a lengthy reference to all the

12    relevant incident report documents prepared by staff. *See id.* Defendant Vanderhoofven included

13    the following final entry that indicated his determinations:

14        > H.    The SHO [senior hearing officer] determined the images of
15        > injuries sustained by MILLER to the neck and throat area are
        > consistent with a stabbing type weapon. SHO further determined,
16        > based upon over 27 years [of] experience, that the focused attack on
        > the neck and throat demonstrated intent to kill rather than to merely
17        > maim or disfigure.

18    *Id.* at 3.

19        Defendant Vanderhoofven assessed a 360-day loss of good time credits as punishment and

20    referred Plaintiff for a SHU assessment. *Id.* ¶ 14, Ex. A. As mentioned above, Plaintiff was later

21    sentenced to a three-year term at the SHU. Dkt. 1-1 at 22.

22            **6.  Plaintiff's State Tort Claim**

23        In August 2011, Plaintiff submitted a damages claim to the California Victim

24    Compensation and Government Claims Board, and he received written notice on October 28, 2011

25    that it was denied. De Caro Decl., Ex. A at 1-3, Dkt. 60.

26    **III.    PROCEDURAL BACKGROUND**

27        **A.    Claims**

28        On November 26, 2013, Plaintiff gave the instant complaint to prison staff for mailing.

United States District Court
Northern District of California

13

Dkt. 1-3 (Envelope) at 2.  On December 5, 2013, the Court received Plaintiff's complaint and marked it filed on that date.  Dkt. 1 (Complaint Form).  Thereafter, the Court found the following claims cognizable against the following named Defendants:

> (1)     a claim of deliberate indifference to Plaintiff's safety in violation of his Eighth Amendment rights, stemming from the June 9, 2011 incident in which he [got into an altercation with] another prisoner, and Plaintiff has adequately linked Defendants Yang, Clemons, Osten, and Newton to his claim;

> (2)     a claim of the use of excessive force in violation of Plaintiff's Eighth Amendment rights, stemming from the June 9, 2011 incident in which Plaintiff was pepper sprayed and other acts of excessive force was used against him, and Plaintiff has adequately linked Defendants Yang, Clemons, Osten, Newton, and Cabrera to his claim;

> (3)     a claim of deliberate indifference to Plaintiff's serious medical needs in violation of his Eighth Amendment rights, stemming from the failure to properly decontaminate him and treat his injuries stemming from the June 9, 2011 incident, and Plaintiff has adequately linked Defendants Clemons, Newton, [Wood], Tupy, Cabrera, Presler, Butcher, Pimentel, Nakamura, Lentz, and Creed to his claim;

> (4)     a cognizable claim for a denial of due process and a violation of California Penal Code § 2932 against Defendant [Vanderhoofven] based on Plaintiff's allegations regarding the improper guilty finding at the unconstitutional disciplinary hearing and resulting three-year SHU term stemming from the disciplinary rules violation report for "attempted murder for the altercation" on June 9, 2011; and

> (5)     a conspiracy claim under [section] 1983 against Defendants Creed, Lentz, Nakamura, Clemons, Pimentel, [Wood], Tupy, Cabrera and Newton for conspiring to conceal the constitutional violations, specifically the use of excessive force against Plaintiff.

Dkt. 19 at 2-3 (citing Dkt. 1-1 at 19-20; 25-29) (brackets added).  The Court also exercised supplemental jurisdiction over Plaintiff's state law claims.  *Id.* at 3.  The Court dismissed the remaining claims, including Plaintiff's supervisory liability claims against Defendants Cate, Beard, Ducart, and Barns, claims relating to the grievance procedure against Defendants Lewis, Olson, and McLean, retaliation and denial of access to the courts claims against Defendant Reich, and claims against Doe Defendants.  *Id.*

### B.   Pending Motions

Defendants' joint motion to dismiss presents the following arguments:  (1) Plaintiff's claims for injunctive and declaratory relief should be dismissed as moot; (2) his claims for deliberate indifference to safety, excessive force against Defendant Cabrera, and conspiracy fail to state a claim and should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6); (3) all claims under California's Penal Code and Constitution should be dismissed because no private right of action exists; and (4) his official capacity claims for damages should be dismissed because of Eleventh Amendment immunity.  Dkt. 53 at 1.  Defendants also move jointly for summary judgment under Federal Rule of Civil Procedure 56 because there is no genuine dispute as to any material fact regarding: (1) Plaintiff's claims that Defendants Clemons, Newton, Osten, and Yang were deliberately indifferent to his safety; (2) Defendants Yang, Clemons, Osten, Newton, and Cabrera used excessive force; (3) Defendants Clemons, Newton, Wood, Tupy, Cabrera, Pimentel, Presler, Butcher, Nakamura, Lentz, and Creed were deliberately indifferent to serious medical needs; (4) Defendant Vanderhoofven denied due process; and (5) Defendants Creed, Lentz, Nakamura, Clemons, Pimentel, Wood, Tupy, Cabrera, and Newton conspired to conceal the use of excessive force.  *Id.*  Finally, Defendants claim they are also entitled to qualified immunity, and seek summary judgment against Plaintiff's state law claims because he did not comply with the California Government Claims Act.  *Id.*  Plaintiff has filed an opposition to the motion in response to which Defendants have filed a reply.  Dkts. 101-103, 110.  The motion is now fully briefed and ripe for adjudication.  In addition, Plaintiff's aforementioned pending motions will be addressed below.

## IV.   DISCUSSION ON PLAINTIFF'S PENDING MOTIONS

### A.   Motion for Correction of Record

Plaintiff has filed a motion entitled, "Motion for Correction of Record from the Court's Incorrect and Inflammatory Statements."[4]  Dkt. 97.  Plaintiff takes issue with the Court indicating in its October 29, 2014 Service Order and in another subsequent Order that Plaintiff "made a claim

---

[4] Plaintiff has also requested a courtesy copy of his motion for correction of record.  Dkt. 97 at 1.  Such a request is GRANTED.  The Clerk of the Court shall send Plaintiff a copy of this motion (dkt. 97) along with his copy of this Order.

United States District Court
Northern District of California

that '. . . he was attacked by another prisoner . . .'" *Id.* at 1 (quoting Dkt. 19 at 2, Dkt. 93 at 1). Plaintiff claims that "[D]efendants are the cause of the injuries he suffered on the day(s) of the incident . . . ." *Id.* at 2.  Plaintiff claims that he alleged that he was involved in an "altercation" with inmate Miller.  *Id.* (citing Dkt. 11-12).  Plaintiff requests the Court correct the record to reflect that it was an "altercation."  *Id.*  Plaintiff also makes other requests, including requests to strike such statements from the record and "expunge" copies of the aforementioned Orders that "contain these incorrect implications," and to question Defendants and their counsel as to "who they provided copys [sic] of, showed, told about these specific documents (19 and/or 93) on or prior to June 19, 2015." *Id.* at 3.

As mentioned above, in its October 24, 2014 service order, the Court had found a cognizable claim of deliberate indifference to safety.  Whether Plaintiff was "attacked by" or was involved in an "altercation" with inmate Miller does not change this finding.  However, Plaintiff's request to correct the record to reflect that it was an "altercation" with inmate Miller is GRANTED only to the effect that the Court will refer to the incident as an "altercation" or a "fight" between the inmates in this Order and in any subsequent Orders.  All Plaintiff's other request, i.e., to strike or expunge the record and to question Defendants, are DENIED as unnecessary.  Therefore, Plaintiff's motion for correction of record is GRANTED in part and DENIED in part.  Dkt. 97.

### B.    Motion for Reconsideration of Denial of Motion for Appointment of Counsel

Plaintiff has filed a motion entitled, "Motion for Reconsideration for Pro Bono Assignment/Order for Defendants' Colleagues (CDCR) to Refrain from Harassment Via Inappropriate Housing-Moves-Transfers/For Defendant[s'] Colleagues to Appropriately House Plaintiff in General Population Without Further Harassment."  Dkt. 108.

Rule 60(b) provides for reconsideration only upon a showing of: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered before the court's decision; (3) fraud by the adverse party; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) any other reason justifying relief.  *See* Fed. R. Civ. P. 60(b).  Subparagraph (6) requires a showing that the grounds justifying relief are

1    extraordinary.

2           Here, Plaintiff presents no grounds that warrant reconsideration of the Court's denial of his

3    motion for appointment of counsel.  The Ninth Circuit has held that a district court may ask

4    counsel to represent an indigent litigant only in "exceptional circumstances," the determination of

5    which requires an evaluation of both (1) the likelihood of success on the merits and (2) the ability

6    of the plaintiff to articulate his claims *pro se* in light of the complexity of the legal issues involved.

7    *Terrell v. Brewer*, 935 F.2d 1015, 1017 (9th Cir. 1991).  Plaintiff has been able to present his

8    claim adequately, and the issues are not complex.  Accordingly, Plaintiff's motion for

9    reconsideration of the Court's Order denying appointment of counsel is DENIED.  Dkt. 108.

10          Furthermore, to the extent that Plaintiff's motion complains about constitutional violations

11   at CMF, or stemming from his transfer from California State Prison - Sacramento to CMF, such

12   claims must be brought in a separate lawsuit in the United States District Court for the Eastern

13   District of California, the proper venue for claims arising in Solano and Sacramento Counties,

14   where CMF and California State Prison - Sacramento are located, respectively.  *See* 28 U.S.C.

15   § 1391(b); 28 U.S.C. § 84(b).

16   **V.    DISCUSSION ON JOINT MOTION TO DISMISS AND MOTION FOR
             SUMMARY JUDGMENT**
17

18          **A.    Legal Standard for Motion to Dismiss**

19          Dismissal for failure to state a claim is a ruling on a question of law.  *See Parks School of*

20   *Business, Inc., v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  "The issue is not whether the

21   plaintiff ultimately will prevail, but whether he is entitled to offer evidence to support his claim."

     *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).
22

23          Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the

24   claim showing that the pleader is entitled to relief."  "Specific facts are not necessary; the

25   statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon

26   which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citations omitted).  "While a

27   complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

     allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'
28

United States District Court
Northern District of California

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . .  Factual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).

A motion to dismiss should be granted if the complaint does not proffer "enough facts to state a claim for relief that is plausible on its face." *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . .   The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 678-683 (2009) (finding under *Twombly* and Rule 8 of the Federal Rules of Civil Procedure that complainant-detainee in a *Bivens* action failed to plead sufficient facts "plausibly showing" that top federal officials "purposely adopted a policy of classifying post-September-11 detainees as 'of high interest' because of their race, religion, or national origin" over more likely and non-discriminatory explanations).

That being said, a *pro se* pleading must be liberally construed, and "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Twombly*, 550 U.S. at 570 (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  Review is limited to the contents of the complaint, *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994), including documents physically attached to the complaint or documents the complaint necessarily relies on and whose authenticity is not contested.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

Conclusory allegations of law are insufficient to defeat a Rule 12(b)(6) motion.  *Id.* at 679. In deciding a Rule 12(b)(6) motion, the court may take judicial notice of facts that are not subject to reasonable dispute.  *Id.* at 688-89 (discussing Fed. R. Evid. 201(b)).  Allegations of fact in the complaint must be taken as true and construed in the light most favorable to the nonmoving party. *Id.* at 688.   The court need not accept as true allegations that contradict facts which may be judicially noticed by the court.  *See Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987), *cert. denied*, 486 U.S. 1040 (1988).

1

2

**B.      Legal Standard for Summary Judgment**

Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment on some or all of the claims or defenses presented in an action.  Fed. R. Civ. P. 56(a)(1).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The movant bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A) (requiring citation to "particular parts of materials in the record").  If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  *See Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'"  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting in part *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.  A factual dispute is genuine if it "properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party."  *Id.* at 250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  *Id.*  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (internal citations omitted).

A district court may only consider admissible evidence in ruling on a motion for summary judgment.  *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002).  Unauthenticated documents and hearsay evidence are inadmissible, and consequently, may not be

*United States District Court*
*Northern District of California*

considered on summary judgment.  *Orr*, 285 F.3d at 773-74, 778.

In support of their joint motion to dismiss and motion for summary judgment, Defendants have submitted a declarations from all fourteen Defendants, as well as declarations from: Health Records Technician Renea Daniels; Government Claims Program Custodian of Records Katrina De Caro; California Correctional Health Care Services Associate Information Systems Analyst R. Hoheb; and Former Chief Medical Officer M. Sayre.  Dkts. 54-72.

Health Records Technician Daniels, who is the custodian of health records, certifies that the documents attached to her declaration are true and accurate copies of original documents from Plaintiff's health record.  Daniels Decl. at 1, Attach., Dkt. 59-1 at 2-21.  Attached to Associate Information Systems Analyst Hoheb's declaration are the following documents concerning the event in question: (1) the search result showing that Defendant Nakamura created seven documents concerning medical care provided to Plaintiff; (2) screen shots of the documents associated with the June 9, 2011 and June 10, 2011 entries concerning Plaintiff and listing Defendant Nakamura as the medical provider; (3) the result from the search of the Patient Information System determining when the June 9, 2011 and June 10, 2011 entries were initiated, saved and protected within the Patient Information System.  Hoheb Decl., Exs. A, B, C, Dkt. 61-1.  Associate Information Systems Analyst Hoheb's certifies that the attached three documents are true and correct copies of the original documents.  Hoheb Decl. ¶¶ 5, 6, 7.  Former Chief Medical Officer Sayre certifies that the documents attached to his declaration are true and correct copies of the medical notes prepared by Defendants Nakamura and Creed as well as Registered Nurse Cantrell about the first aid treatment PBSP medical staff provided to Plaintiff after the June 9, 2011 incident, the ambulance records concerning his transfer, and the emergency room records that outline Plaintiff's injuries.  Sayre Decl. ¶¶ 5, 16, 20, Exs. A, B, C.  Finally, attached to Defendant Vanderhoofven's declaration is a copy of portions of the Rules Violation Report and the incident report relating to the June 9, 2011 incident, which Defendant Vanderhoofven certifies to be true and correct copies of the original documents.  Vanderhoofven Decl. ¶¶ 15-16, Exs. A, B, C.  Because the aforementioned documents have been properly authenticated pursuant to Federal Rule of Evidence 803(6), the Court will consider these documents in connection with Defendants'

joint dispositive motion.

Among the exhibits attached to Defendant Tupy's declaration is a copy of a portion of the PBSP Use of Force Policy. Tupy Decl., Ex. D. Defendant Tupy states that the submitted exhibit is a true and correct copy of what it purports to be. Tupy Decl. ¶ 10. Defendant Tupy's declaration is sufficient to authenticate the Use of Force Policy because, as a PBSP correctional lieutenant, he is familiar with the contents of that document. Therefore, the Court will also consider the Use of Force Policy in connection with the instant joint dispositive motion.

Plaintiff has verified his supplement to his complaint, declaration[5] in support of his opposition, and surreply by signing them under penalty of perjury. Dkts. 1-1, 103, 113. However, Plaintiff has not verified his opposition or his "Statement of Disputed Factual Issues" because he failed to sign either under penalty of perjury. Plaintiff has also submitted a declaration by inmate Vincent C. Bruce; however, that document is unverified because it has not been signed under penalty of perjury by inmate Bruce. Dkt. 95 at 3-4. The Court may treat the allegations in the verified complaint and declaration as opposing affidavits to the extent such allegations are based on Plaintiff's personal knowledge and set forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating a plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, he stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Also attached to Plaintiff's complaint and opposition is the same emergency room record attached to Dr. Sayre's declaration. Dkt. 1-2 (Compl., Ex. A); Dkt. 103-4 (Opp'n, Ex. D). In addition, attached to the opposition is the same relevant sections from PBSP's Use of Force Policy that are attached to Defendant Tupy's declaration. Dkt. 103-3 (Opp'n, Ex. C(iv.)). As these documents are evidence

---

[5] Defendants have filed a separate objection to Plaintiff's declaration in support of his opposition based on several grounds, including that many of his assertions are speculative, conclusory, lack proper foundation, or inadmissible under the Federal Rules of Evidence. Dkt. 111. The Court notes Defendants' objections and stresses that it only considers Plaintiff's allegations in his declaration to the extent such allegations are based on his personal knowledge and set forth specific facts admissible in evidence. *See Schroeder*, 55 F.3d at 460 & nn.10-11. Further, the Court may, in this Order, refer to Plaintiff's verified declaration in support of his opposition as his "opposition" or cite to it as "Decl. In Supp. Opp'n."

United States District Court
Northern District of California

1   already considered in connection with the summary judgment motion, the Court will also consider

2   the same documents submitted by Plaintiff.

3       **C.**    **Claims of Injunctive and Declaratory Relief**

4       Defendants argue that Plaintiff's transfer to CMF renders moot his claims for injunctive

5   and declaratory relief.  The Court agrees.

6       It is well established that the transfer of an inmate to another prison while his claims are

7   pending generally will moot any claims for injunctive relief.  *See Dilley v. Gunn*, 64 F.3d 1365,

8   1368-69 (9th Cir. 1995).  The same is true for claims seeking declaratory relief.  *See Alvarez v.*

9   *Hill*, 667 F.3d 1061, 1063-64 (9th Cir. 2012).  The reasons for finding mootness in such a context

10  are clear:

11          Once an inmate is removed from the environment in which he is
    subjected to the challenged policy or practice, absent a claim for
12  damages, he no longer has a legally cognizable interest in a judicial
    decision on the merits of his claim.  Any declaratory or injunctive
13  relief ordered in the inmate's favor in such situations would have no
    practical impact on the inmate's rights and would not redress in any
14  way the injury he originally asserted.  And the newly situated inmate
    has no further need for such declaratory or injunctive relief, for he is
15  free of the policy or practice that provoked his lawsuit in the first
    place.

16  *Incuma v. Ozmint*, 507 F.3d 281, 287 (4th Cir. 2007) (quoted in *Alvarez*, 667 F.3d at 1064).

17      Although Plaintiff was previously incarcerated at PBSP, his transfer to CMF rendered

18  moot his claims for injunctive and declaratory relief against PBSP officials.  Accordingly,

19  Defendants' motion to dismiss Plaintiff's claims for injunctive and declaratory relief as moot is

20  GRANTED.

21      Plaintiff may proceed with his claims for monetary damages, and the Court will now

22  resolve the pending joint dispositive motion as to the remaining claims for such damages, as

23  discussed below.

24      **D.**    **Eleventh Amendment Immunity**

25      Defendants seek dismissal of Plaintiff's section 1983 damages claim against them in their

26  official capacities.  This Court agrees that dismissal is in order as to such claims.  It is well

27  established that, absent consent, the Eleventh Amendment bars from the federal courts suits

28  against a state by its own citizens or citizens of any foreign state.  *Atascadero State Hosp. v.*

United States District Court
Northern District of California

22

United States District Court
Northern District of California

*Scanlon*, 473 U.S. 234, 237-38 (1985).  This immunity extends to suits against state officials sued in their official capacities.  *See Kentucky v. Graham*, 473 U.S. 159, 169-70 (1985).  Here, because neither California nor Defendants have consented to the suit, Plaintiff's section 1983 damages claims against Defendants in their official capacities are barred by the Eleventh Amendment, and Defendants' motion to dismiss as to this claim is GRANTED.  *See id.*

The Eleventh Amendment does not bar Plaintiff from seeking damages under section 1983 against Defendants in their individual capacities, however.  *See id.* at 167 n.14.  Therefore, the Court will continue resolve the pending joint dispositive motion as to the remaining claims against Defendants in their individual capacities.

### E.    Deliberate Indifference to Safety

The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of prisoners.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  In particular, prison officials have an affirmative duty to protect inmates from violence at the hands of other inmates. *See id.* at 833.  The failure of a prison official to protect inmates from attacks by other inmates or from dangerous conditions at the prison violates the Eighth Amendment only when two requirements are met: (1) the objective component—the deprivation alleged must be sufficiently serious, *see Farmer*, 511 U.S. at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); and (2) the subjective component—the prison official must possess a sufficiently culpable state of mind.  *See id.* (citing *Wilson*, 501 U.S. at 297).

In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation.  *Id.* at 834 (citing *Wilson*, 501 U.S. at 298).  With respect to the subjective component, the requisite state of mind depends on the nature of the claim.  In prison-conditions cases, the necessary state of mind is one of "deliberate indifference."  *See, e.g.*, *Allen v. Sakai*, 48 F.3d 1082, 1084-87 (9th Cir. 1994) (outdoor exercise); *Farmer*, 511 U.S. at 834 (inmate safety); *Estelle*, 429 U.S. at 104 (inmate health); *Wilson*, 501 U.S. at 302-03 (general conditions of confinement).

A prison official cannot be held liable under the Eighth Amendment for failing to

23

1    guarantee the safety of a prisoner unless the standard for criminal recklessness is met, i.e., the

2    official knows of and disregards an excessive risk to inmate health or safety.  *See Farmer*, 511

3    U.S. at 837.  The official must both be aware of facts from which the inference could be drawn

4    that a substantial risk of serious harm exists, and then, in fact, draw the inference.  *See id.*

5         Deliberate indifference describes a state of mind more blameworthy than negligence.  *See*

6    *Farmer*, 511 U.S. at 835 (citing *Estelle*, 429 U.S. at 104).  Neither negligence nor gross negligence

7    will constitute deliberate indifference.  *See Farmer*, 511 U.S. at 835-36 & n.4; *see also Estelle*,

8    429 U.S. at 106 (establishing that deliberate indifference requires more than negligence).

9         Here, to be liable for failure to prevent serious harm to an inmate, Defendants Yang,

10   Clemons, Osten, and Newton must each individually know of and consciously disregard an

11   excessive risk to Plaintiff's safety.  *See Farmer*, 511 U.S. at 837.

12        The Court finds that Plaintiff has failed to raise a triable issue as to whether the

13   aforementioned Defendants acted with deliberate indifference in regard to guaranteeing his

14   personal safety.  To survive the summary judgment motion, Plaintiff must raise a triable issue of

15   fact as to both the objective and subjective prongs of the deliberate indifference standard.

16   Viewing the evidence in the light most favorable to Plaintiff, no triable issue exists because

17   Defendants were not subjectively deliberately indifferent to a risk to Plaintiff's safety.

18        In his opposition and surreply, Plaintiff contends that Defendant Yang "intentionally"

19   opened his cell door.  Dkt. 103 at 2; Dkt. 113 at 1.  However, such a contention is pure

20   speculation, and not based on Plaintiff's own personal knowledge.  Plaintiff's unsupported

21   speculation about Defendant Yang's mental state does not create a triable issue of fact.  *See*

22   *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001) (plaintiff's

23   belief that defendant acted with an unlawful motive, without supporting evidence, is not

24   cognizable evidence on summary judgment.)  Moreover, Defendants point out that Plaintiff has

25   previously attested under penalty of perjury that he does not know whether Defendant Yang

26   opened his door intentionally or negligently.  De Caro Decl., Attach., Dkt. 60-1 at 5.  In his claim

27   to the California Victim Compensation and Government Claims Board, which is signed under

28   penalty of perjury, Plaintiff indicated under the section directed him to "[e]xplain the

United States District Court
Northern District of California

24

1   circumstances that led to the damage or injury," that "[p]rison officials intentionally and/or

2   negligently opened my cell door; that caused the incident . . . that led to the use of excessive force

3   and injuries describe." *Id.*  In his surreply, Plaintiff argues that he "made no such "attestment" or

4   above statement." Dkt. 113 at 1.  However, whether or not Plaintiff made such a statement is

5   irrelevant because the Court has determined above that Plaintiff cannot speculate on whether or

6   not Defendant Yang acted intentionally.  *See Carmen*, 237 F.3d at 1028.  Therefore, Plaintiff's

7   speculative statement that Plaintiff  Yang acted intentionally is not cognizable evidence on

8   summary judgment.  *Id.*

9           Instead, the Court finds that the facts as alleged amount at most to negligence based on

10  Defendant Yang's action of mistakenly opening Plaintiff's cell door and Defendants Clemons's,

11  Osten's, and Newton's actions of failing to intervene quickly enough to guarantee Plaintiff's

12  safety.[6]  Negligence and even gross negligence are not enough to amount to an Eighth Amendment

13  violation.  *Farmer*, 511 U.S. at 835.  Deliberate indifference is not shown by merely stating that a

14  defendant should have known of a risk, but requires an actual perception of a risk that does not

15  exist merely because a reasonable person should have perceived a risk.  *Id.* at 836 & n.4.

16          Plaintiff's deliberate indifference claim with respect to Defendant Yang is untenable as a

17  matter of law because this Defendant was unaware of any risk of harm associated with letting

18  inmate Miller into the F-pod from the yard into what this Defendant believed was his cell.  As

19  mentioned above, Defendant Yang claims to have *mistakenly* opened Plaintiff's cell instead.

20  Defendant Yang did not actually know of nor could this Defendant infer that letting inmate Miller

21  in from the yard would expose Plaintiff to a substantial risk of harm.  Furthermore, Defendants

22  Clemons, Osten, and Newton responded immediately upon recognizing that the inmates were

23  involved in an altercation.

24          At best, Defendants may have acted negligently in failing to assure Plaintiff's safety.

25  _____

26          [6] In his surreply, Plaintiff claims that Defendants Clemons and Newton "blatantly lied to
    conceal that they were present when [Defendant] Yang opened the cell door[] and their counsel

27  simply overlook[ed] this disputed fact." Dkt. 103 at 2.  However, the Court has taken the facts in
    the light most favorable to Plaintiff and even if Defendants Clemons and Newton *were present* and

28  failed to intervene when Defendant Yang opened the cell door, these facts would only amount to
    negligence.  *See supra.*

1    Plaintiff has not presented any evidence that Defendants Yang, Clemons, Osten, or Newton acted

2    with criminal recklessness.  Therefore, the Court finds that Plaintiff has failed to raise a triable

3    issue of fact as to whether Defendants Yang, Clemons, Osten, and Newton acted with deliberate

4    indifference under the subjective prong of *Farmer*.  511 U.S. at 834.  Defendants Yang, Clemons,

5    Osten, and Newton are entitled to a judgment as a matter of law on Plaintiff's claim of deliberate

6    indifference to safety, and the motion for summary judgment is GRANTED as to this claim.

7          **F.    Excessive Force Claims**

8          In order to state a claim for the use of excessive force in violation of the Eighth

9    Amendment, Plaintiff must allege facts that, if proven, would establish that prison officials applied

10   force "maliciously and sadistically to cause harm," rather than in a good-faith effort to maintain or

11   restore discipline.  *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  Not every malevolent touch by a

12   prison guard gives rise to a federal cause of action; the Eighth Amendment's prohibition of cruel

13   and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of

14   physical force.  *Id.* at 9-10.  Guards may use force only in proportion to the need for it in each

15   situation.  *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979).

16         In determining whether the use of force was for the purpose of maintaining or restoring

17   discipline or, rather, for the malicious and sadistic purpose of causing harm, a court may evaluate

18   the need for the application of force, the relationship between that need and the amount of force

19   used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials,

20   and any efforts made to temper the severity of a forceful response.  *Hudson*, 503 U.S. at 7.

21   However, courts must accord prison administrators wide-ranging deference in the adoption and

22   execution of policies and practices to further institutional order and security.  *Bell v. Wolfish*, 441

23   U.S. 520, 547 (1979); *Jeffers v. Gomez*, 267 F.3d 895, 917 (9th Cir. 2001).

24         The Court finds that Plaintiff has failed to raise a triable issue as to whether the actions of

25   Defendants Yang, Clemons, Osten, and Newton—which all stem from the June 9, 2011 incident in

26   which OC spray and an exact impact round were used on Plaintiff—amounted to excessive force.[7]

27   _____

28         [7] Plaintiff claims that Defendant Clemons, Osten and Newton sprayed him with OC spray.
     Dkt. 1-1 at 8.  Defendants Osten and Newton contend that did not use such force, contrary to

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    To overcome the summary judgment motion, Plaintiff must raise a triable issue of fact

2    establishing that Defendants Yang, Clemons, Osten, and Newton applied force "maliciously and

3    sadistically to cause harm," rather than in a good-faith effort to maintain or restore discipline.

4    To promote staff safety, CDCR policy dictates that correctional officers should not rush

5    into resorting to the use of OC spray or exact impact rounds to stop inmates who are fighting, and

6    instead, must order inmates to cease fighting.  Tupy Decl., Ex. D at 318.  In situations where

7    inmates disregard those orders, correctional officers are directed to use certain use of force

8    options, such as OC spray and exact impact rounds.  *Id.*

9    **1.  Use of OC Spray**

10    After Plaintiff's and inmate Miller's refusal to comply with the direct orders of

11    correctional officers and his disorderly behavior, Defendant Clemons states that he determined

12    that resorting to OC spray was necessary to maintain order, specifically, he was concerned that the

13    inmates would kill each other.  Clemons Decl. ¶¶ 5, 6, 8.  Defendant Clemons complied with

14    CDCR policy, which required him to use OC spray—the lowest level of force—to keep Plaintiff

15    from hurting himself or others.  *See Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) (where,

16    "after adequate warning," a prisoner acts in such a way as to present "a reasonable possibility that

17    slight force will be required," use of chemical spray "may be a legitimate means for preventing

18    small disturbances from becoming dangerous").  Thus, Defendant Clemons states that he acted to

19    preserve order in response to a reasonably perceived threat that was created by Plaintiff and

20    inmate Miller, and Plaintiff offers no contrary evidence.[8]  Clemons Decl. ¶¶ 5, 6, 8.  Therefore, a

21

22    Plaintiff's allegations.   Osten Decl. ¶ 17; Newton Decl. ¶ 20.  Taking the facts in the light most
favorable to Plaintiff, the Court will analyze the excessive force claim based on an alleged use of
force by Defendant Clemons, Osten and Newton.  Meanwhile, Plaintiff's excessive force claims
against Defendant Cabrera will be resolved below under Plaintiff's claim of supervisory liability
24    against this Defendant.

25    [8] In his surreply, Plaintiff claims that Defendants misrepresented the facts by stating in
their joint reply that "by [Plaintiff's] own admission, the officers were required to continue their
efforts to eliminate the threat—a threat that would only end when both inmates were handcuffed
and separated."  Dkt. 113 at 1 (quoting Dkt. 110 at 7).  Plaintiff requests that Defendants' counsel
be "sanctioned appropriately for making such misleading, slanderous and false assertions."  *Id.* at
2.  The Court finds that sanctions are not warranted, and DENIES Plaintiff's request.  The
undisputed evidence in the record shows that there was a threat to the security of the prison caused
by Plaintiff and inmate Miller's June 9, 2011 altercation.  Whether or not Plaintiff made an

1   finder of fact could reasonably conclude that some force by Defendant Clemons was necessary to

2   maintain order, and that his use of OC spray was acceptable under the circumstances.  *See id.* (a

3   demonstrably dangerous and painful substance, tear gas, did not violate the Eighth Amendment

4   when used to contain disturbances that threatened an equal or greater harm); *see also Michenfelder*

5   *v. Sumner*, 860 F.2d 328, 334-36 (9th. Cir. 1988) (noting that while tear gas may not be used to

6   punish a prisoner, it can be reasonably used to quell disorders and to compel obedience).  As

7   mentioned above, Defendants Osten and Newton claim they did not use force, contrary to

8   Plaintiff's allegation that they sprayed him with OC spray.  Dkt. 1-1 at 8; Osten Decl. ¶ 17;

9   Newton Decl. ¶ 20.  However, taking Plaintiff's contention in the light most favorable to him,

10   Defendants argue the evidence shows Defendants Osten and Newton are entitled to summary

11   judgment.  Dkt. 53 at 17.  The Court agrees.  The undisputed evidence shows that Plaintiff and

12   inmate Miller were ignoring orders to stop fighting and get down, and Plaintiff admits he and

13   inmate Miller were still fighting when Defendants Osten and Newton allegedly sprayed them.

14   Dkt. 1-1 at 8.  Therefore, the purported use-of-force by Defendants Clemons, Osten and Newton

15   was justified because it was a good-faith effort to restore order, and no reasonable jury could find

16   that these Defendants applied such force maliciously and sadistically to cause harm.  *See Hudson*,

17   503 U.S. at 7.  Thus, they are entitled to summary judgment.

### 2.  Use of Exact Impact Round

19       Plaintiff asserts Defendant Yang used excessive force by firing an exact impact round

20   using his 40 mm. single shot rifle.  Dkt. 1-1 at 8.  First, if the factfinder determines that Defendant

21   Yang's firing of an exact impact round constitutes excessive force in this circumstance, it also

22   reasonably could find that Defendant Yang acted with the requisite malicious intent.  *See Hudson*,

23   503 U.S. at 6-7.  It is undisputed that Defendant Yang fired the exact impact round in response to

24   a prison fight, and therefore the question is whether Defendant Yang chose a type of force that was

25   excessive in this circumstance.  Defendants have submitted evidence that showing that Defendant

27   admission that "officers were required to continue their efforts to eliminate the threat" is not
relevant to the Court's analysis.  Moreover, such a statement is again considered pure speculation
28   by Plaintiff and is not cognizable evidence on summary judgment.  *See Carmen*, 237 F.3d at 1028.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Yang only resorted to the use of the exact impact round *after* Defendant Clemons had utilized two

2    bursts of OC spray without any success at stopping the fight.  *See* Yang Decl. ¶ 14; Clemons Decl.

3    ¶ 6; Newton Decl. ¶¶ 7-9; Osten Decl. ¶¶ 7-8.  In his declaration in support of his opposition,

4    Plaintiff claims that he did not hear any commands to stop fighting and that after he was hit with

5    OC spray he "was no longer fighting and [was] merely holding on to protect [him]self."  Dkt. 103

6    (Decl. In Supp. of Opp'n) at 3.  Such a statement is not supported by the record.  The officers

7    testified that they gave Plaintiff multiple orders to stop fighting and get down.  Yang Decl. ¶¶ 12-

8    13, 18; Clemons Decl. ¶¶ 4, 6; Newton Decl. ¶¶ 6-7; Osten Decl. ¶¶ 7, 9.  The record shows that

9    after the OC spray was used, Plaintiff was still holding inmate Miller, and thus the inmates were

10   not separated and continued to fight.  Yang Decl. ¶¶ 14-15; Clemons Decl. ¶¶ 6-7; Newton Decl.

11   ¶ 7; Osten Decl. ¶ 7.  Defendant Yang also claims that he intended to hit inmate Miller's lower left

12   leg, but his Plaintiff's lower right shin area instead due to the "scuffle."  Yang Decl. ¶ 14.

13   Moreover, again in his declaration, Plaintiff claims that he was hit by *two* impact rounds, and he

14   was "struck directly in [his] shin and struck directly atop [his] foot."  Dkt. 103 at 3.  In any case,

15   the evidence shows that after the exact impact round (or rounds) hit Plaintiff in the leg, Plaintiff

16   and inmate Miller separated and stopped fighting.  *See* Newton Decl. ¶¶ 10-12; Osten Decl. ¶ 10;

17   Clemons Decl. ¶ 7.  Therefore, only the exact impact round (or rounds) and *not* the OC spray

18   proved to be effective in stopping the fight.  Defendant Yang claims that he used the 40 mm.

19   single shot launcher for the purpose of restoring inmate safety, discipline and order.  Yang Decl.

20   ¶ 19.

21        Applying the several *Hudson* factors to the evidence before the Court leads to the

22   conclusion that the force used by Defendant Yang did not violate Plaintiff's Eighth Amendment

23   rights.  First, there was a need for the use of some force.  It is undisputed that a fight was in

24   progress between Plaintiff and inmate Miller, and an officer's efforts to quell the fight by resorting

25   to OC spray were unsuccessful.  It is further undisputed that Defendant Yang and many other

26   officers on scene ordered the inmates to stop fighting and get down, but the inmates refused.  It is

27   also undisputed that the inmates were in the process of fighting moments before the exact impact

28   round was fired, and, in fact, Defendant Yang claims he aimed for inmate Miller but hit Plaintiff in

29

the shin instead.  The fighting stopped once Plaintiff was hit with the exact impact round.  While a dispute exists as to whether Defendant Yang fired one or two impact rounds in succession, no evidence has been presented that the use of the exact impact rounds continued after Plaintiff and inmate Miller complied with the officers' orders to stop fighting and get down.

Second, the parties disagree about the extent of the injury inflicted on Plaintiff—specifically as to the injury to Plaintiff's left foot, which Defendants claim resulted when inmate Miller stomped on Plaintiff's foot.  That the impact rounds caused injury does not necessarily indicate the force was excessive.  Moreover, in *Hudson,* the Supreme Court focused on whether the slight nature of the injury inflicted could defeat an Eighth Amendment claim, rather than whether an extreme injury always meant the force was excessive.  *See Hudson*, 503 U.S. at 7. This one factor is not dispositive and does not overcome the fact that all the other factors weigh heavily in favor of a finding that the force used was necessary under the circumstances.

Third, the evidence is undisputed that a threat was reasonably perceived by the responsible officials: a fight was in progress, and both inmates refused to follow officers' orders to stop fighting.

Fourth, Defendant Yang attempted to temper the severity of his response by giving verbal commands before he used the exact impact round.  The evidence shows that neither the verbal commands nor the OC spray stopped the fight.  Plaintiff has not provided any evidence that the force used was more than necessary to stop the fight under the circumstances.  *See Hudson*, 503 U.S. at 7.  Even viewing the evidence in the light most favorable to Plaintiff, any reasonable jury would determine that the exact impact round or rounds were used in a good-faith effort to restore order and no reasonable jury could find that Defendant Yang applied such force maliciously and sadistically to cause harm.  *Id.*  Therefore, Defendant Yang is entitled to summary judgment.

### 3.  Handcuffing Plaintiff

Finally, Plaintiff also alleges that Defendant Clemons used excessive force by using handcuffs after the fight ended.  Dkt. 1-1 at 9-10.  However, the evidence shows that Plaintiff was physically able to move to the cuff port and submit to cuffs, and Defendant Clemons could not have removed Plaintiff from the F-pod unless Plaintiff was restrained.  *See* Clemons Decl. ¶¶ 9-13.

30

Requiring Plaintiff to cuff-up, in these circumstances, was not an excessive use of force, and no reasonable jury could find that Defendant Clemons acted maliciously and sadistically to cause harm. *See Hudson*, 503 U.S. at 7. Thus, summary judgment as to this Defendant on this ground is warranted.

### 4. Summary

In sum, Plaintiff failed to establish a triable issue of fact that he was subjected to excessive force by Defendants Yang, Clemons, Osten, and Newton. These Defendants therefore are entitled to judgment as a matter of law on the Eighth Amendment excessive force claim, and Defendants' motion for summary judgment is GRANTED as to this claim.

### G. Qualified Immunity as to Deliberate Indifference to Safety and Excessive Force Claims

In the alternative, Defendants argue that summary judgment is warranted because, as government officials, they are entitled to qualified immunity from Plaintiff's Eighth Amendment claims. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether the right was clearly established, such that it would be clear to a reasonable official that his or her conduct was unlawful in the situation that was confronted. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The inquiry of whether a constitutional right was clearly established must be undertaken in light of the "specific context" of the case, not as a broad general proposition. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Here, the Court has found no evidence that the actions of Defendants Yang, Clemons, Osten, and Newton rose to the level of a constitutional violation. However, assuming that Plaintiff was deprived of a constitutional right, the Court next considers whether these Defendants' conduct was clearly unlawful. Plaintiff alleges that these Defendants were deliberately indifferent to his safety by Defendants Yang's actions of opening his cell door and Defendant Clemons, Osten, and

United States District Court
Northern District of California

1   Newton's failure to respond adequately upon seeing Plaintiff and inmate Miller fighting.   Plaintiff

2   also alleges that the actions of Defendants Yang, Clemons, Osten, and Newton amounted to

3   excessive force, which all stem from the June 9, 2011 incident in which OC spray and an exact

4   impact round were used on Plaintiff.

5          The Court finds that Defendants are entitled to qualified immunity because they have

6   produced sufficient evidence that a reasonable officer in their position would have believed that

7   their actions were reasonable based on the circumstances they confronted.  Plaintiff's release into

8   F-pod was the result of a mistake in placing the control key in the incorrect plug.  Defendant Yang

9   discovered this mistake only after noticing Plaintiff rush down the stairs at inmate Miller.

10  Defendant Yang immediately sounded the alarm and attempted to separate the inmates by ordering

11  them to stop fighting and to get down.  Meanwhile, Defendant Osten heard Defendant Yang shout

12  "get down," noticed the inmates fighting in F-pod, and also attempted to separate the inmates by

13  ordering them to stop fighting and to get down.  Following CDCR policy, Defendant Clemons

14  ordered the inmates to cease fighting, only resorted to OC spray after the inmates failed to comply,

15  and resorted again to OC spray a second time when the inmates continued to fight even after being

16  hit the first time with OC spray.  While the parties dispute as to whether Defendants Newton and

17  Osten used OC spray, even taking the facts in the light most favorable to Plaintiff, the record

18  shows that the officers resorted to such force after giving orders to stop fighting and that the

19  inmates did not stop fighting even after the use of OC spray.  Defendant Yang also only resorted

20  to the exact impact round (or rounds) after the inmates failed to comply with his multiple orders to

21  stop fighting and to get down and the other officers' use of OC spray.

22          Upon recognizing that two inmates were inadvertently released into the same area and

23  were fighting, it would not have been clear to a reasonable officer that the immediate actions taken

24  by Defendants were unlawful.  Additionally, a reasonable officer in Defendants' positions would

25  have thought it lawful to use OC spray and an exact impact round (or rounds) on Plaintiff after he

26  disobeyed orders to cease fighting, especially in light of CDCR policy dictating that particular

27  protocol.  Because the law and circumstances on June 9, 2011 did not put Defendants individually

28  on notice that their conduct would be clearly unlawful, summary judgment based on qualified

immunity is appropriate.  *See Saucier*, 533 U.S. at 202.  Accordingly, Defendants' motion for summary judgment as to the deliberate indifference to safety and excessive force claims against Defendants Yang, Clemons, Osten, and Newton is GRANTED on the ground that they are entitled to qualified immunity as well.[9]

**H.    Excessive Force and Supervisory Liability Claims Against Defendant Cabrera**

Defendants argue that Plaintiff fails to state an excessive force claim against Defendant Cabrera because Plaintiff does not allege any facts showing that Defendant Cabrera used force against him and caused Plaintiff an unnecessary and wanton infliction of pain. Dkt. 53 at 13 (citing *Hudson*, 503 U.S. at 6-7; *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  The Court agrees. Nowhere in the complaint did Plaintiff allege that Defendant Cabrera used any force against him or ordered prison staff to use such force. See Dkt. 1-1 at 7-11.  Therefore, Plaintiff has not stated a claim for excessive force against Defendant Cabrera and Plaintiff's excessive claim is DISMISSED.  *See* Fed. R. Civ. P. 12(b)(6).

Instead, the Court points out that in his complaint, Plaintiff alleged a supervisory liability claim against Defendant Cabrera, a correctional sergeant, by claiming this Defendant was "responsible for the safety and well-being of prisoners and/or the supervision and discipline of subordinate medical and correctional staff during these events." Dkt. 1-1 at 4.  However, the Ninth Circuit has stated:

> [S]ection 1983 suits do not impose liability on supervising officers under a respondeat superior theory of liability.  Instead, supervising officers can be held liable under section 1983 "only if they play an affirmative part in the alleged deprivation of constitutional rights." [citation omitted].  The supervising officer has to "set in motion a series of acts by others . . . which he knew or reasonably should have known, would cause others to inflict the constitutional injury." [citation omitted].

*Graves v. City of Coeur D'Alene*, 339 F.3d 828, 848 (9th Cir. 2003) *abrogated on other grounds by Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County*, 542 U.S. 177 (2004).

---

[9] The Court's finding that Defendants Yang, Clemons, Osten, and Newton are entitled to summary judgment as to Plaintiff's deliberate indifference to safety claim obviates the need to address Defendants' alternative argument that the deliberate indifference to safety claim must be dismissed for failure to state a claim for relief.

Additionally, a supervisor may be liable under section 1983 if a plaintiff can show that "'in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy-makers . . . can reasonably be said to have been deliberately indifferent to the need.'" *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002); *see also Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc), *abrogated on other grounds*, *Farmer*, 511 U.S. 825 ("Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation.").

Here, nothing in Plaintiff's pleadings sufficiently indicates Defendant Yang's opening of Plaintiff's cell door while inmate Miller outside of his cell was anything but Defendant Yang's own isolated mistake resulting from a failure to place the control key in the correct plug. The Court finds that Plaintiff fails to allege sufficient facts to support his supervisory liability claim against Defendant Cabrera. Nowhere does Plaintiff allege that Defendant Yang's mistaken action was the result of a deficient prison policy, that Defendant Cabrera directed or set events into motion that resulted in Plaintiff's alleged injury, or that any kind of training could have prevented Defendant Yang's mistake. Even if Plaintiff had alleged sufficient facts showing that Defendant Cabrera could be liable in his supervisory capacity, because Defendants Yang, Clemons, Osten, and Newton were found not liable for any claims, there would be no supervisory liability.

Because Plaintiff did not plead any facts which could support an excessive force claim or a supervisory liability claim against Defendant Cabrera under section 1983, the Court GRANTS Defendants' motion to dismiss Plaintiff's claims against Defendant Cabrera relating to excessive force or supervisory liability.

## I.   Deliberate Indifference to Medical Needs

Federal law establishes that deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle*, 429 U.S. at 104. To prove that the response of prison officials to a prisoner's medical needs was constitutionally deficient, the prisoner must establish (1) a serious medical need and (2) deliberate indifference to

that need by prison officials. *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  A medical need is defined as "serious" if the failure to treat the prisoner's condition could result in further significant injury or the "'[u]nnecessary and wanton infliction of pain.'"  *Id.* at 1059 (quoting *Estelle*, 429 U.S. at 104).  A prison official is deemed "deliberately indifferent" if the official knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.  *Farmer*, 511 U.S. at 847.  In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm.  *See McGuckin*, 974 F.2d at 1060; *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).

Once the prerequisites are met, it is up to the fact finder to determine whether a defendant exhibited deliberate indifference.  A plaintiff need not prove complete failure to treat.  Deliberate indifference may be shown where access to medical staff is meaningless as the staff is not competent and does not render competent care.  *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989).  Such indifference may also appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provide medical care.  *See McGuckin*, 974 F.2d at 1062 (delay of seven months in providing medical care during which medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim).  For a delay in treatment to constitute an Eighth Amendment violation, the delay must have caused substantial harm.  *See Shapley*, 766 F.2d at 407.

Here, Plaintiff claims that Defendants Clemons, Newton, Wood, Tupy, Cabrera, Presler, Butcher, Pimentel, Nakamura, Lentz, and Creed were deliberately indifferent to his serious medical needs for failing to decontaminate him properly and treat his injuries stemming from the June 9, 2011 incident.

Plaintiff has failed to raise a triable issue of fact that the aforementioned Defendants were deliberately indifferent to his medical needs.  The undisputed evidence does not show a denial of medical care after Plaintiff was hit with OC spray.

United States District Court
Northern District of California

1    The following timeline, taken from the undisputed facts in the factual background above,

2  shows that Plaintiff was decontaminated by being immediately removed from the area where the

3  OC spray was used, flushing his eyes and face with cold water at the D-facility clinic, and given

4  yogurt to relieve pain as well as a cold water wash at hospital, and then allowed to shower the next

5  day:

6    June 9, 2011:

7         7:53 p.m.        - Alarm sounded when fight began.  LVN Creed responded on scene.

8         7:58 p.m.        - RN Nakamura called to respond.

9         7:59-8:01 p.m.  - RNs Nakamura and Lentz arrive while Plaintiff en route to clinic.

10        8:02-8:40 p.m.  - Plaintiff arrives at D-facility clinic and given cold water decontamination.

11        8:40 p.m.        - Plaintiff wheeled to parking area to be taken to hospital.

12        9:07 p.m.        - Ambulance arrives.

13        9:33 p.m.        - Arrives at hospital.  Given yogurt and cold water wash decontamination.

14    June 10, 2011:

15        3:00 a.m.        - Arrives at PBSP CTC. Allowed to use sink water to decontaminate in cell.

16        3:00 p.m.        - Plaintiff is allowed to shower with PBSP CTC inmates during third watch.

17  Thus, the undisputed evidence shows that minutes after the cell fight started, medical staff were

18  alerted and responded to the scene.  As soon as Plaintiff was handcuffed, he was taken out of the

19  contaminated area where he was hit with OC spray and rushed to the D-facility clinic.

20    In response, Plaintiff first complains that Defendants Clemons and Cabrera required him to

21  cuff-up before decontaminating him or providing first aid.  However, the Court finds that Plaintiff

22  fails to raise a triable issue of fact that the aforementioned Defendants were deliberately

23  indifferent to his medical needs by doing so.  The undisputed evidence shows that Plaintiff had

24  just been in a fight with inmate Miller, and that after the inmates were separated, he was

25  physically able to move to the cuff-port and submit to cuffs.  Defendant Tupy claims that pursuant

26  to PBSP policy, staff could not remove him from the F-pod and take him to the clinic without

27  restraints.  *See* Tupy Decl. ¶ 12, Ex. D.  The time frame above also shows that it must have only

28  taken a few minutes for Plaintiff to submit to handcuffs.  Therefore, Defendants Clemons and

1    Cabrera are entitled to summary judgment as to Plaintiff's deliberate indifference to serious

2    medical needs claim against them.

3           Second, Plaintiff claims that after he arrived at the clinic, there was an hour delay before he

4    was treated and decontaminated because Defendants Pimentel had to retrieve his camera to

5    photograph Plaintiff's injuries. Dkt. 1-1 at 11-13.  Plaintiff claims that during this delay,

6    Defendants Clemons, Newton, Wood and Tupy denied his requests for them to order medical staff

7    to provide care for his injuries and decontaminate him.  *Id.* at 10-12.  Plaintiff concedes that after

8    Defendant Pimentel returned with a camera and while Plaintiff was still at the clinic, medical staff

9    treated his injuries and "squeeze[e]d a wet rag over him" to decontaminate him.  *Id.* at 13.  Based

10   on the timeline, Plaintiff must have received the initial cold water decontamination before he was

11   wheeled to the parking lot at 8:40 p.m.  Thus, the undisputed evidence shows that he was given

12   treatment for his injuries and cold water decontamination within at the most 38 minutes after

13   arriving at the clinic at 8:02 p.m.  Even if one accepts as true Plaintiff's statements that

14   Defendants' did not provide medical care for him or decontaminate him for one hour, the record

15   still shows that as soon as he was handcuffed, Plaintiff was immediately removed from the

16   contaminated area and exposed to fresh air.  Based on PBSP policy, decontamination may be

17   accomplished by exposing the individual to "fresh moving air."  Tupy Decl., Ex. D at 321.

18   Therefore, even if Defendant Pimentel caused an hour delay, Plaintiff has failed to raise a triable

19   issue of fact that the aforementioned Defendants were deliberately indifferent to his medical needs

20   because they initially acted to decontaminate him by exposing him to fresh air immediately after

21   he was handcuffed.  Further, because medical staff eventually treated Plaintiff, these Defendants

22   are entitled to summary judgment because no harm resulted from the alleged one-hour delay.[10]

23   *See Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (prisoner alleging delay of medical

24

25           [10] In his surreply, Plaintiff argues that "[D]efendants' counsel has intentionally withheld
26   presenting the video (CD) and/or photographs to support this [joint] motion . . . ."  Dkt. 113 at 4.
     Plaintiff claims the video and photographic evidence will support his argument that an hour passed
27   before Defendants provided medical care for him or decontaminate him.  *Id.*  However, no such
     video or photographic evidence is necessary because the Court accepted as true Plaintiff's
28   statements relating to the hour-long delay, but it still found that Defendants are entitled to
     summary judgment because no harm resulted.  *See supra.*

treatment evinces deliberate indifference must show that delay led to further injury); *cf. Shapely*, 766 F.2d at 407 (delay providing surgery in which the delay proved harmful would state an Eighth Amendment claim).  As soon as Defendant Pimentel arrived with the camera, Plaintiff concedes that he was treated for his injuries and given cold water decontamination from Defendant Nakamura at the clinic.  PBSP policy states that "flushing the affected body with cool water" is also another method of decontamination.  Tupy Decl., Ex. D at 321.  In addition, at the hospital, Plaintiff was given additional treatment for his injuries and further decontaminated when a nurse applied yogurt on his affected areas and when Plaintiff was put under a mist of water from a nozzle in the ambulance dock.

Third, Plaintiff complains that he was prevented from fully decontaminating because was not allowed to shower until 3:00 p.m. the following day.  While Plaintiff may not have been immediately allowed to shower, as mentioned above, he was offered two other methods of decontamination: fresh moving air and flushing the affected body with cold water.  Further, Plaintiff  PBSP policy on "Decontamination from Chemical Agents - General" states that "[t]he need to medically treat an inmate for serious injury may supersede the need to decontaminate from the effects of exposure to chemical agents." Tupy Decl., Ex. D at 321.  Because Plaintiff suffered multiple injuries from the fight, prison officials rushed him to the clinic for treatment and then to the hospital to receive additional treatment.   The record shows that Defendants told Plaintiff there was no time for him to shower because they had to transport him to the parking lot to await the ambulance, and then to the hospital.  In the meantime, as mentioned above, medical staff treated his injuries from the fight.  The ultimate point of the Eighth Amendment's requirement that prison officials not be deliberately indifferent to an inmate's serious medical needs is so that the inmate does not suffer cruel and unusual punishment by being denied medical care. *See generally Estelle*, 429 U.S. at 102-04.  For Plaintiff, as for other inmates, the Eighth Amendment does not grant a right to a specific course of conduct (i.e., there is no Eighth Amendment right to a lengthy decontamination shower, just as there is no Eighth Amendment right to have one brand of pain reliever instead of another with comparable properties). *Cf. Toguchi v. Chung*, 391 F.3d 1051, 1058, 1059-60 (9th Cir. 2004) (mere difference of opinions regarding the course of medical

treatment fails to state a claim for deliberate indifference).

Under the circumstances here—an inmate who suffered multiple injuries from a fight and also had been exposed to OC spray—the Eighth Amendment required that medical help be summoned for the inmate and that decontamination occur.  The Eighth Amendment does not provide a specific right to a shower but instead requires that correctional officers not be deliberately indifferent to a risk to the inmate's safety or medical needs.  It is undisputed that medical help was summoned for Plaintiff and that he was transported to the clinic and later to the hospital to be treated for his injuries.  The medical staff was promptly alerted that Plaintiff had been exposed to OC spray.  No evidence has been presented that those Defendants who were correctional officers could exert any control over the medical care of Plaintiff once the medical staff was notified of his medical problems.  As for the Defendants who were part of the medical staff, the record demonstrates that these Defendants responded to Plaintiff's injuries and need for decontamination.  Defendants Nakamura, Creed and Lentz are entitled to summary judgment because they provided Plaintiff with appropriate medical care when he arrived in the D-Facility clinic.  These Defendants rendered basic first aid, protected Plaintiff's back and neck, and decontaminated him from OC spray by flushing his face and eyes with water.  Nakamura Decl. ¶¶ 4-15, Ex. A; Creed Decl. ¶¶ 5-8, Ex. A.  Because of potential neck and back injuries, the record shows that they would have violated medical protocols if had they let Plaintiff shower.  Sayre Decl. ¶¶ 3-11, 18.  While their decision to decontaminate Plaintiff with cold water instead of a shower may not have been precisely what Plaintiff requested or desired, a mere difference of opinions regarding the course of medical treatment fails to state a claim for deliberate indifference. *See Toguchi*, 391 F.3d at 1058, 1059-60.

Finally, when Plaintiff returned to PBSP CTC after receiving treatment and cold water decontamination at the hospital, he claims that Defendants Butcher and Presler were deliberately indifferent for failing to allow him to shower.  However, PBSP policy states that "[n]o other decontamination is necessary for inmates who have been medically treated and health care staff have determined the inmate has been decontaminated."  Tupy Decl., Ex. A at 321.  Defendants Butcher and Presler claim they understood that Plaintiff had been previously decontaminated  by

United States District Court
Northern District of California

1    medical staff prior to coming back to PBSP CTC.  Butcher Decl. ¶ 3; Presler Decl. ¶ 3.  Moreover,

2    both Defendants gave Plaintiff access to water in the sink in his cell and instructed him on how to

3    self-decontaminate.  Butcher Decl. ¶ 5; Presler Decl. ¶ 5.  Further, the record shows that

4    Defendant Butcher had security concerns when he denied Plaintiff's request to shower during first

5    watch.  Butcher Decl.  ¶ 4.  The record shows that Plaintiff was eventually allowed to shower at

6    3:00 p.m. along with all the inmates at PBSP CTC during third watch.  The evidence indicates that

7    Defendants Butcher and Presler were not deliberately indifferent by refusing to allow Plaintiff to

8    shower until third watch.

9        In sum, even when the evidence is viewed in the light most favorable to Plaintiff, and

10   inferences therefrom drawn in his favor, a reasonable jury could not find that Defendants

11   Clemons, Newton, Wood, Tupy, Cabrera, Presler, Butcher, Pimentel, Nakamura, Lentz, and Creed

12   were deliberately indifferent to Plaintiff's serious medical needs.  Accordingly, the

13   aforementioned Defendants are entitled to judgment as a matter of law on this claim.  Because the

14   evidence in the record establishes that these Defendants were not deliberately indifferent to

15   Plaintiff's serious medical needs, they are also entitled to prevail as a matter of law on their

16   defense of qualified immunity to this claim.  Accordingly, Defendants' motion for summary

17   judgment is GRANTED as to this claim.

18        **J.**    **Due Process and Penal Code Claims**

19        Plaintiff contends Defendant Vanderhoofven violated his due process rights and violated

20   California Penal Code § 2932 by not providing him the opportunity to prepare for the September

21   15, 2011 disciplinary hearing, at which he was found guilty for "attempted murder for the

22   altercation" on June 9, 2011, and assessed 360-day loss of credit and a three-year SHU term.

23   Specifically, Plaintiff claims that Defendant Vanderhoofven proceeded with the hearing even after

24   Plaintiff protested that he was not prepared given: (1) he was not assigned an I.E.; (2) he was not

25   able to obtain a list of documents he would have requested from the I.E.; (3) he was not able to

26   prepare any witnesses; (4) the hearing officer relied on staff reports that were "fabricated to

27   conceal that Plaintiff's injuries resulted from staff"; (5) the hearing officer failed to document of

28   consider Plaintiff's protests and arguments during the hearing; (6) the hearing officer's

United States District Court
Northern District of California

"conclusion [was] not supported by reports which fail to state if Plaintiff ever had a weapon in his hands at any time during the altercation"; (7) the hearing officer's "reasoning for the denial [of] Plaintiff's request for witnesses, documents, and [an] I.E. [was] false, contradictory and/or [made] no [sense]"; and (8) the staff reports fail[ed] to state any facts showing that [Plaintiff] was attempting to murder anyone." Dkt. 1-1 at 21-22.

Prisoners retain their right to due process subject to the restrictions imposed by the nature of the penal system. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Consequently, although prison disciplinary proceedings are not part of a criminal prosecution and the full panoply of rights due a defendant in such proceedings does not apply, the due process clause requires certain minimum procedural protections where serious rules violations are alleged, the power of prison officials to impose sanctions is narrowly restricted by state statute or regulations, and the sanctions are severe. *See id.* at 556-57, 571-72 n.19.

Defendants argue that Plaintiff's due process rights were not violated during his September 15, 2011 disciplinary hearing because he was accorded the required minimum due process. Dkt. 53 at 22-23.

*Wolff* established five procedural protections required by the federal constitutional guarantee of due process for inmates facing disciplinary proceedings: (1) adequate written notice of the charges, (2) receipt of the written notice at least twenty-four hours before the hearing, (3) ability to present documentary evidence and call witnesses unless doing so will be "unduly hazardous to institutional safety or correctional goals," (4) the factfinder must make a written statement of the evidence relied upon and the reasons behind the disciplinary action, and (5) assistance from a fellow inmate or staff member if the inmate is illiterate or the issues are complex. *Wolff*, 418 U.S. at 566-70. The undisputed facts show that Plaintiff was afforded the procedural protections under *Wolff*, as explained below.

### 1. Adequate Written Notice of the Charges

During the disciplinary hearing, Defendant Vanderhoofven confirmed with Plaintiff that he had received a copy of the serious RVR along with the related incident report documents more than twenty-four hours before the hearing, such that Plaintiff was duly informed of the charges

against him, which satisfies the first *Wolff* requirement.  Vanderhoofven Decl. ¶ 5, Ex. B.
Defendant Vanderhoofven additionally confirmed that Plaintiff was served with the
aforementioned documents on June 17, 2011, which is within fifteen days after the June 9, 2011
incident.  *Id.* ¶ 7.

### 2.  Timely Receipt of the Written Notice

The undisputed facts also indicate that the second requirement was satisfied as Plaintiff
had sufficient time to prepare a defense after receiving the notice based on the following:
(1) Plaintiff had elected to postpone the hearing until after the district attorney determined whether
to initiate criminal proceedings; (2) the hearing did not commence until September 15, 2011,
which was well after he had received notice on June 17, 2011 and within thirty days after the
district attorney notified PBSP that Plaintiff would not be prosecuted on August 19, 2011;
(3) Plaintiff received a copy of the related incident reports, Incident Report Log Number PBSP-
FD06-11-06-0237, more than 24 hours before the disciplinary hearing; (4) Plaintiff had time to
prepare specific questions for Defendant Clemons, who was the only witness Plaintiff had
requested to appear at the hearing; (5) Plaintiff had time to fill out a CDCR Form 22, Request for
Interview, Item or Service, in which he requested copies of numerous confidential documents; and
(6) Plaintiff had time to examine the photographs of the crime scene more than twenty-four hours
before the hearing.  *Id.* ¶ 5-7; 10-12, Ex. A.

### 3.  Plaintiff's Ability to Present Documentary Evidence and Call Witnesses

As to the third requirement, the Court finds that Defendant Vanderhoofven properly denied
Plaintiff's request for documents that were irrelevant to his attempted murder charge.  *See Wolff*,
418 U.S. at 566; *Graves v. Knowles*, 213 Fed. Appx. 670, 671-72 (9th Cir. 2007).  However,
Plaintiff also alleges that Defendant Vanderhoofven prohibited him from questioning witnesses at
the disciplinary hearing.  Specifically, Plaintiff claims that Defendant Vanderhoofven denied his
right to question Defendant Clemons about whether he saw Plaintiff "in the possession of a
weapon and/or if they [saw Plaintiff] use a weapon at any point during the brief altercation with
the other prisoner on June 9, 2011."  Dkt. 103 (Decl. In Supp. of Opp'n) at 7.

While an inmate has the right to present evidence in his defense, the Supreme Court found

1    that an inmate does not have the right to confidential, irrelevant, or unnecessary information, *see*

2    *Wolff*, 418 U.S. at 556, and the opportunity to call witnesses and present documentary evidence is

3    also limited by the rule that "[p]rison officials must have the necessary discretion to keep the

4    hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or

5    undermine authority . . . ."  *Ponte v. Real*, 471 U.S. 491, 496 (1984).

6          Here, Plaintiff asserts that Defendant Vanderhoofven ended Plaintiff's questioning and

7    refused to allow him to further question Defendant Clemons because Defendant Vanderhoofven

8    believed the questions were irrelevant.  Dkt. 103 at 7.  Plaintiff asserts that the questions he had

9    wanted to ask Defendant Clemons, specifically as to the aforementioned weapon, were his "efforts

10   to mitigate the false charge [of attempted murder]."  *Id.*

11         The evidence is undisputed that Defendant Vanderhoofven did not allow Plaintiff to

12   further question Defendant Clemons at the hearing.  Defendant Vanderhoofven claims that he

13   determined that the questions were related to Plaintiff's grievance concerning the use of excessive

14   force, not to the attempted murder charge.  Vanderhoofven Decl. ¶ 11.  Meanwhile, Plaintiff

15   claims he wanted to ask a specific question that was relevant to the attempted murder charge

16   because it related to whether he possessed a weapon during the altercation.  Dkt. 103 (Decl. In

17   Supp. of Opp'n) at 7.  In essence, Plaintiff claims that he wanted to introduce evidence that he did

18   not possess a weapon to "mitigate the false charge," i.e., whether Plaintiff was guilty of attempted

19   murder against inmate Miller.  *Id.*  However, based on the evidence outlined below, the Court

20   finds that no triable issue of material fact exists as to whether there was a violation of Plaintiff's

21   due process rights in these proceedings based on Defendant Vanderhoofven's refusal to allow

22   Plaintiff to further question Defendant Clemons at the hearing.

23         The information in hearing summary relating to the "Div. A-1 (1) offense ATTEMPTED

24   MURDER" explains the offense in detail, stating:

25            *Murder* is deliberate killing of another person with either malice
            aforethought or reckless indifference.  The intent to commit murder
26            rather than battery can be judged by expressed intent of the inmate
            or the nature of the attack or the weapon used.  If any reasonable
27            person would assume death as most likely outcome from the nature
            of attack or the weapon used, this offense qualifies as *Attempted
28            murder.  Attempted* means the offense was begun but not completed

United States District Court
Northern District of California

because of circumstances beyond the control of the inmate. Attempted must also include present ability.  *Present ability* means the attempt could have succeeded.

Vanderhoofven Decl., Ex. A at 2.  Defendant Vanderhoofven based his decision relating to Plaintiff's guilt by a "preponderance of the evidence" after he "reviewed the [RVR], the photographs taken of the crime scene and of [Plaintiff's] and [inmate] Miller's injuries, the Incident Report and supplements to it, and the non-confidential medical reports . . . that outlined the injuries [inmate] Miller and [Plaintiff] sustained during their fight."  *Id.* ¶ 13.  As indicated above, the hearing summary indicated that the offense qualifies as attempted murder "[i]f any reasonable person would assume death as the most likely outcome from the nature of the attack *or the weapon used*."  *Id.*, Ex. A at 2 (emphasis added).  While Plaintiff's line of questioning focused on whether there was a "*weapon used*," Defendant Vanderhoofven's decision was mostly based on the "*nature of the attack*."  *See id.*  Defendant Vanderhoofven's analysis of the "nature of the attack" involved taking into consideration the incident reports indicating that Plaintiff had rushed out of his cell after his cell door was inadvertently opened, and engaged in a fight with inmate Miller that left inmate Miller with injuries to the neck and throat area demonstrating "intent to kill rather than to maim or disfigure."  *Id.*, Ex. A at 3.  Defendant Vanderhoofven thus disallowed Plaintiff's line of questioning relating to the "weapon used" because the "nature of the attack" analysis was sufficient to find Plaintiff guilty of attempted murder.  *Id.* ¶¶ 11, 13-14.  Defendant Vanderhoofven determined that the evidence Plaintiff had wanted to present through Defendant Clemons's testimony was unnecessary and irrelevant to the determination of whether Plaintiff was guilty of attempted murder.  *Cf. Baxter v. Palmigiano*, 425 U.S. 308, 321 (1976) (recognizing that, within the prison disciplinary context, reasonable limitations to circumscribe the right to call witnesses and present evidence include irrelevance and lack of necessity); *compare Serrano v. Francis*, 345 F.3d 1071, 1079-80 (9th Cir. 2003) (finding a due process violation where hearing officer failed to offer a convincing explanation for why he did not allow witnesses and failed to follow state regulation requiring him to document his reasons for refusing to grant inmate's request for a witness).

Based on the undisputed evidence presented, the Court finds that it was reasonable for

44

United States District Court
Northern District of California

1    Defendant Vanderhoofven to deny Plaintiff's from continuing his questions of Defendant Clemons

2    relating to the presence of a weapon because they were unnecessary and irrelevant to the issue of

3    whether Plaintiff was guilty of attempted murder, especially in light of the overwhelming evidence

4    relating to the "nature of the attack." *See, e.g.*, *Davis v. Sherman*, No. 14-cv-01897-AWI-SKO-

5    HC, 2015 WL 737967, *3-*4 (E.D. Cal. Feb. 20, 2015) (concluding that the decision to disallow

6    an inmate from calling inmate witnesses because their potential testimonies was irrelevant to the

7    determination of guilt at a disciplinary hearing was reasonable and did not state a due process

8    violation); *McAfee v. Curry*, No. 09-2497 EMC (PR), 2011 WL 2912876, *12 (N.D. Cal. July 20,

9    2011) (concluding that "[n]o reasonable jury could find a due process violation based on the

10   failure to call a witness who had no relevant information"), *aff'd by McAfee v. Rivero*, 491 Fed.

11   Appx. 826 (9th Cir. 2012) (unpublished memorandum disposition).

12        Finally, to the extent Plaintiff is alleging that there was insufficient evidence to find him

13   guilty of attempted murder, the Court disagrees.  Even where the discipline imposed is neither so

14   severe as to implicate the Due Process Clause itself, nor does it implicate a state created liberty

15   interest, it nonetheless violates an inmate's right to procedural due process if the discipline is

16   supported by no evidence.  *See Burnsworth v. Gunderson*, 179 F.3d 771, 773-74 (9th Cir. 1999)

17   (putting escape conviction supported by no evidence on prisoner's record violates procedural due

18   process rights).  The relevant standard is that of *Superintendent v. Hill*, 472 U.S. 445, 457 (1985).

19   The standard for the modicum of evidence required is met if there was "some evidence" from

20   which the conclusion of the administrative tribunal could be deduced.  *See id.* at 455.  An

21   examination of the entire record is not required nor is an independent assessment of the credibility

22   of witnesses or weighing of the evidence.  *See id.*  The relevant question is whether there is any

23   evidence in the record that could support the conclusion reached by the disciplinary board.  *See id.*

24        In the present case, the evidence is undisputed that Plaintiff admitted that he engaged in a

25   fight with inmate Miller.  Defendant Vanderhoofven's finding that Plaintiff was guilty of

26   attempted murder was not dependent on whether Defendant Clemons noticed whether Plaintiff had

27   a weapon or not.  As mentioned above, Defendant Vanderhoofven based his finding on the "nature

28   of the attack."  There was evidence showing that Plaintiff instigated the fight by rushing out of his

1    cell towards inmate Miller, engaging in a violent fight that left inmate Miller with injuries to his

2    neck and throat area, which Defendant Vanderhoofven determined were serious enough to

3    demonstrate intent to kill.  Thus, some evidence supports Defendant Vanderhoofven's finding that

4    Plaintiff was guilty of the offense of attempted murder, and the evidence had some indicia of

5    reliability.  Defendant Vanderhoofven relied on the testimony of first-hand witnesses, which

6    included the officers involved, the crime/incident reports of the incident and the Medical Report of

7    Injury/Unusual Occurrence.  Plaintiff's allegation that Defendants falsified reports, even if true,

8    does not change this result.  The fact that a prisoner may have been innocent of the charges does

9    not raise a due process issue.  The Constitution demands due process, not error-free decision-

10    making.  *See Ricker v. Leapley*, 25 F.3d 1406, 1410 (8th Cir. 1994).

11          Therefore, the evidence shows no triable issue of material fact as to whether there was a

12    violation of due process rights in these proceedings stemming from either Defendant

13    Vanderhoofven's denial of Plaintiff's request for irrelevant documents or Defendant

14    Vanderhoofven's refusal to allow Plaintiff's irrelevant questioning of Defendant Clemons.

### 4.   Plaintiff Given Written Statement of Evidence Relied Upon and Reasons Behind Disciplinary Action

16          With respect to the fourth requirement, Defendant Vanderhoofven generated a hearing

17    summary that "articulated the steps and measures [he] took to ensure that [Plaintiff] received due

18    process during the hearing, and specified the evidence [Defendant Vanderhoofven] relied upon in

19    finding [Plaintiff] guilty of attempted murder."  Vanderhoofven Decl. ¶ 5.  The hearing summary

20    indicates that a copy was given to Plaintiff on October 18, 2011 at 5:30 p.m, and therefore he was

21    provided with a written basis for the ruling.  *Id.*, Ex. A at 1-3.

### 5.   Assistance From a Fellow Inmate or Staff Member

23          Lastly, the fifth requirement was satisfied even though Plaintiff was not provided with the

24    assistance of either a staff assistant or an I.E., because such assistance was not warranted under

25    CDCR regulations.  Plaintiff did not meet the criteria for appointment of a staff assistant, as they

26    are intended to help inmates who are illiterate or non-English speaking.  The undisputed facts

27    show that Plaintiff is neither.  Further, Defendant Vanderhoofven denied Plaintiff's request for an

28

*United States District Court*
*Northern District of California*

1    I.E. because he confirmed that Plaintiff already had access to sufficient documents and evidence to

2    defend himself during his hearing, and that the issues were not complex.

3          Accordingly, based on the evidence presented, Defendant Vanderhoofven has shown that

4    there is no genuine issue of material fact with respect to Plaintiff's due process claim.  *See Celotex*

5    *Corp.*, 477 U.S. at 323.  Plaintiff has failed to respond to show otherwise.  Defendant

6    Vanderhoofven is entitled to judgment as a matter of law as to Plaintiff's due process claim

7    against him, and Defendants' motion for summary judgment as to this claim is GRANTED.[11]  *Id.*

8          In addition, Plaintiff's related claim of a violation of California Penal Code § 2932, which

9    imposes a mandatory duty to afford due process protection to prisoners placed in segregation, is

10   DISMISSED because California's Penal Code is a criminal statute that does not create private

11   rights of action and violations of criminal statutes cannot serve as a basis for civil liability. *See*

12   *Ellis v. City of San Diego*, 176 F.3d 1183, 1189 (9th Cir. 1999) (affirming dismissal of sixteen

13   causes of action predicated on violations of the CPC "[b]ecause these code sections do not create

14   enforceable individual rights").  Thus, Defendants' motion to dismiss Plaintiff's Penal Code claim

15   is also GRANTED.

16        **K.    Conspiracy**

17         A civil conspiracy is a combination of two or more persons who, by some concerted

18   action, intend to accomplish some unlawful objective for the purpose of harming another which

19   results in damage.  *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999).  To prove a

20   civil conspiracy, the plaintiff must show that the conspiring parties reached a unity of purpose or

21   common design and understanding, or a meeting of the minds in an unlawful agreement.  *Id.*  To

22   be liable, each participant in the conspiracy need not know the exact details of the plan, but each

23   participant must at least share the common objective of the conspiracy.  *Id.*  A defendant's

24   knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and

25   from evidence of the defendant's actions.  *Id.* at 856-57.

26         Conclusory allegations of conspiracy are not enough to support a section 1983 conspiracy

27

28         [11] The Court finds it unnecessary to address Defendants' alternative argument in support of qualified immunity as to Plaintiff's due process claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    claim.  *Burns v. County of King*, 883 F.2d 819, 821 (9th Cir. 1989) (per curiam).  Although an

2    "agreement or meeting of minds to violate [the plaintiff's] constitutional rights must be shown,"

3    *Woodrum v. Woodward County*, 866 F.2d 1121, 1126 (9th Cir. 1989), "[d]irect evidence of

4    improper motive or an agreement to violate a plaintiff's constitutional rights will only rarely be

5    available.  Instead, it will almost always be necessary to infer such agreements from circumstantial

6    evidence or the existence of joint action." *Mendocino Environmental Center v. Mendocino

7    County*, 192 F.3d 1283, 1302 (9th Cir. 1999).  Thus, "an agreement need not be overt, and may be

8    inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id.* at 1301.

9        Plaintiff alleges a conspiracy claim under section 1983 against Defendants Creed, Lentz,

10    Nakamura, Clemons, Pimentel, Wood, Tupy, Cabrera and Newton for conspiring to conceal the

11    constitutional violations, specifically the use of excessive force against Plaintiff.  However, given

12    the Court's finding that there is no underlying constitutional violation for Plaintiff's excessive

13    force claim, Plaintiff's conspiracy claim fails.  As the Ninth Circuit has held, "[c]onspiracy is not

14    itself a constitutional tort under [section] 1983," and it "does not enlarge the nature of the claims

15    asserted by the plaintiff, as there must always be an underlying constitutional violation." *Lacey v.

16    Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc).  The Court's finding that there is no

17    constitutional violation for the excessive force claim necessarily means that there is no viable

18    claim for conspiracy.  *Id.*; *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010) ("To support a claim

19    of a conspiracy under § 1983, [p]laintiff's [c]omplaint must contain sufficient factual matter to

20    show (1) the existence of an express or implied agreement among the defendant officers to deprive

21    him of his constitutional rights, and (2) an actual deprivation of those rights resulting from that

22    agreement.").  Therefore, Plaintiff's conspiracy claim as to the use of excessive force fails as a

23    matter of law, and Defendants are entitled to summary judgment as to this claim.

24        Assuming arguendo that there was a constitutional violation for the excessive force claim,

25    Plaintiff did not allege facts, rather than speculation, demonstrating that Defendants formed an

26    agreement to violate his rights or conceal an alleged use of force.  *See* Dkt. 1-1 at 8, 18-19.

27    Rather, the evidence shows each officer authored his own report on Plaintiff's fight.  *See* Osten

28    Decl. ¶ 16, Ex. A; Clemons Decl. ¶¶ 16, 18, Exs. A-B; Newton Decl. ¶¶ 19-20, Ex. A; Cabrera

1   Decl. ¶¶ 18-19, Ex. A.  Additionally, Defendant Nakamura could not alter his notes on Plaintiff's

2   medical care because he protected his notes on June 9 and 10, 2011.  *See* Nakamura Decl. ¶¶ 16-

3   17, Ex. A; Hoheb Decl. ¶¶ 3-8, Exs. A-C.  Finally, while Plaintiff alleges he saw Defendant

4   Nakamura working in the CTC office on June 12, 2011, and concludes Nakamura was re-writing

5   his notes, *see* dkt. 1-1 at 18-19, there is no factual basis for this assertion.  Because there is no

6   admissible evidence to support a conspiracy claim, Defendants are entitled to summary judgment.

7   Accordingly, Defendants' motion for summary judgment is GRANTED as to Plaintiff's claim of

8   conspiracy.[12]

9       **L.   State Law Claims**

10          Plaintiff has asserted supplementary state law claims that the actions of Defendants

11   violated the rights afforded to him by California constitutional and statutory law.

12          When adjudicating a supplemental state law claim, the federal courts must apply state

13   substantive law.  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  The California

14   Tort Claims Act ("CTCA") requires that a tort claim against a public entity or its employees be

15   presented to the California Victim Compensation and Government Claims Board, formerly known

16   as the State Board of Control, no more than six months after the cause of action accrues.  *See* Cal.

17   Gov't Code §§ 905.2, 910, 911.2, 945.4, 945.6(a), 950-950.2, 950.6(b).  Presentation of a written

18   claim and action on, or rejection of, the claim are conditions precedent to a suit.  *Mangold v.*

19   *California Pub. Utils. Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995).

20          Defendants assert that Plaintiff has failed to comply with the California Government

21   Claims Act as to his state law claims.  Dkt. 53 at 25.  This Court agrees.  As mentioned above, the

22   California Government Claims Act provides that a claim relating to an injury to a person must be

23   presented no later than six months after the accrual of the cause of action.  First, Plaintiff has not

24   alleged that he complied with the Claims Act's requirements in his compliant, and there is no

25   evidence that he submitted a claim with the Board concerning his alleged due process violations.

26

27          [12] The Court's grant of summary judgment as to the conspiracy claim obviates the need to

28   address the alternative argument that it must be dismissed for failure to state a claim for relief.

49

United States District Court
Northern District of California

1   *See generally* Dkt. 1-1; *see also* De Caro Decl. at 1-11.[13]  Second, Plaintiff did not comply with

2   the CTCA because he failed to submit his federal civil rights complaint within six months of the

3   denial of the state's rejection of his damages claim relating to the June 9, 2011 incident.  *See* Cal.

4   Govt. Code §§ 945.4, 945.6(a), 950.6(b).  Here, Plaintiff received notice that his state claim was

5   rejected on October 28, 2011.  *See* De Caro Decl. at 1-3.  Plaintiff declares that he mailed his

6   complaint by giving it to prison staff for mailing on November 26, 2013—more than two years

7   after October 28, 2011.  *See* Dkt. 1-3 at 2; *see also Moore v. Twomey*, 120 Cal. App. 4th 910, 913

8   (2004) ("[A] civil complaint by a *pro se* prisoner litigant should be deemed filed when it is

9   delivered to prison authorities for forwarding to the superior court.").  Thus, the Court finds that

10  Plaintiff has failed to comply with the CTCA, and therefore Plaintiff's state law claims are

11  DISMISSED.

12          In addition, there is no right to recover damages for alleged violations of Article 1, sections

13  7 and 15 of the California Constitution, and therefore the Court also DISMISSES Plaintiff's

14  claims that Defendants violated the rights afforded to him by California constitutional. *See*

15  *Katzberg v. Regents of Univ. of Cal.*, 29 Cal.4th 300, 328-29 (2002).

16          Accordingly, the Court GRANTS Defendants' motion to dismiss as to Plaintiff's

17  supplementary state law claims.

18  **VI.   CONCLUSION**

19          For the reasons outlined above, the Court rules as follows:

20          1.      Plaintiff's motion for correction of record is GRANTED in part and DENIED in

21  part.  Dkt. 97.  Plaintiff's request is GRANTED only to the extent that the Court will refer to the

22  June 9, 2011 incident as an "altercation" or a "fight" between Plaintiff and inmate Miller in this

23  Order and in any subsequent Orders.  All Plaintiff's other request, i.e., to strike or expunge the

24  record and to question Defendants, are DENIED as unnecessary.  Plaintiff separate request for a

25  courtesy copy of his motion for correction of record is also GRANTED.  The Clerk shall send

26

27          _____

28          [13] Courts may take judicial notice of records and reports of administrative bodies,
    including documents from the California Victim Compensation and Government Claims Board.
    *See Marsh v. San Diego County*, 432 F. Supp. 2d 1035, 1043-45 (S.D. Cal. 2006).

Plaintiff a copy of this motion (dkt. 97) along with his copy of this Order.

2.      Plaintiff's motion for reconsideration of the Court's Order denying appointment of counsel is DENIED.  Dkt. 108.  Any claims relating to constitutional violations at CMF or stemming from his transfer from California State Prison - Sacramento to CMF must be brought in a separate lawsuit in the United States District Court for the Eastern District of California.

3.      Defendants' Joint Motion to Dismiss and Motion for Summary Judgment is GRANTED as to all claims.   Dkt. 53.

4.      The Clerk shall enter judgment, terminate all pending motions, and close the file.

5.      This Order terminates Docket Nos. 53, 97, and 108.

IT IS SO ORDERED.

Dated: March 18, 2016

_____
YVONNE GONZALEZ ROGERS
United States District Judge